UNITED STATES, Appellee

v.

Matthew W. MAZZA, Boatswain's Mate Second Class
U.S. Navy, Appellant

No. 09-0032

Crim. App. No. 200400095

United States Court of Appeals for the Armed Forces

Argued April 28, 2009

Decided July 15, 2009

STUCKY, J., delivered the opinion of the Court, in which EFFRON,
C.J., and BAKER, ERDMANN, and RYAN, JJ., joined.


<u>Counsel</u>


For Appellant:  Major Anthony W. Burgos, USMC (argued).

For Appellee:  Major Elizabeth A. Harvey, USMC (argued);
Lieutenant Timothy H. Delgado, JAGC, USN, and Brian K. Keller,
Esq. (on brief).

Military Judges:  J. P. Lisiecki and J. G. Meeks


<u>**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION**</u>.

Judge STUCKY delivered the opinion of the Court.

We granted review in this case to determine whether the Appellant's civilian defense counsel (CDC) was ineffective by: (1) soliciting human lie detector testimony; (2) failing to object to admission of the victim's videotaped interview; and (3) permitting the videotape to be viewed during deliberations. We find that the CDC was not ineffective, and affirm the decision of the United States Navy-Marine Corps Court of Criminal Appeals (CCA).

## I.  Background

Appellant was a boatswain's mate second class (E-5) at the time of his offenses.  He was originally convicted at a general court-martial of repeated indecent acts with his minor daughter, AM, and of communicating indecent language to her.  Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000). Court members sentenced him to a dishonorable discharge, confinement for 108 months, and reduction to E-1.  The CCA found that the military judge had erred in denying a defense challenge for cause against a court member, and authorized a rehearing. United States v. Mazza, No. NMCCA 200400095, 2005 CCA LEXIS 265, at *10-*11, 2005 WL 2105296, at *3-*4 (N-M. Ct. Crim. App. Aug. 29, 2005) (unpublished).

At his retrial, a general court-martial composed of members convicted Appellant of indecent acts with AM and communicating

2

indecent language to her, Article 134, UCMJ, and sentenced him to a bad-conduct discharge and confinement for four years.

## II.  Appellant's Second Trial

AM was eighteen when she testified at Appellant's second court-martial.  She testified that Appellant's sexual abuse of her began when she was as young as six.  Furthermore, Appellant's wife testified that Appellant had confessed to her that he had molested their daughter.

## A.  Testimony of Dr. Horowitz

At Appellant's second court-martial the Government offered Dr. Sarah Horowitz, who had testified at the first trial, as an expert witness in child sexual abuse cases.  Dr. Horowitz was qualified and testified.

Prior to Dr. Horowitz's testimony, the military judge restricted her to a general discussion of delayed disclosure of child sex abuse cases.  Dr. Horowitz was not to talk about the particular witnesses in this case, but could discuss generally delayed and tentative disclosure patterns in child sex abuse cases.  On direct examination, she did so.

The CDC's overall theory was that the accusations made by AM were false and that both AM and Appellant's wife had motives to lie.  Thus, on cross-examination the CDC questioned Dr. Horowitz concerning disclosure patterns in child sex abuse cases.  Based on his experience in the first trial, the CDC

expected certain testimony from Dr. Horowitz on delayed and false reports and intended to challenge her on those topics.

Specifically, the CDC asked Dr. Horowitz about a study which the CDC believed contradicted her conclusions regarding the delayed reporting of child sexual abuse. In response, Dr. Horowitz stated that the study in question involved both adults and children and that "the dynamics of incest" were "entirely different." The CDC then pursued a line of questioning regarding "interviewer bias," "transference," "secondary gain," and "malingering," implying that such issues could be responsible for the delayed reporting in the instant case. Dr. Horowitz disagreed.

During the course of these questions, the military judge stepped in to caution the CDC that if he required a "yes or no answer" he needed to ask less convoluted questions. The military judge instructed the CDC to re-ask his question, but the CDC instead stated that Dr. Horowitz should respond to his earlier question regarding the prevalence of malingering and primary or secondary gains in cases of sexual abuse. She did, stating that in cases of child sexual abuse there was a six percent rate of false accusation and that in cases of false accusation it was very rarely the child victim who made the false accusation. At this point, the military judge instructed

4

the members to leave the courtroom and began a colloquy with the
CDC:

> MJ:  When I stop somebody, I don't want you to come
> back to me, and basically say, "I am going to let
> her testify."  I've got other concerns that I've got
> to worry about.
>
> It would appear to me, as we start throwing out
> statistics and things along these lines, that there
> may be issues that you are not thinking about or
> objecting to, but I've got to be concerned about
> contamination of the members.
>
> I stopped her, and you interrupted me stopping
> her because of concern that what she was talking
> about, statisticwise [sic], was going to perhaps
> damage or present evidence that was not admissible
> to the members.
>
> . . . .
>
> Okay.  Well again, in the area of false report,
> okay, she brought that up.  That's what I was
> attempting to stop.  Okay?
>
> Because, frankly, I don't know why I didn't
> allow anything to come in, and two -- are you
> seeking to get that particular information in front
> of the members so that you can attack it?
>
> [CDC]:  Absolutely, yes.
>
> . . . .
>
> MJ:  You are specifically wanting her -- let me make
> sure I'm track[ing].  You are specifically wanting
> her to get into detail about the Canadian study and
> other studies concerning false reporting, and the
> low level of that reporting?
>
> Is that -- I just want to make sure --
>
> [CDC]:  Yes.
>
> . . . .

MJ:  And you've considered -- you've considered the consequences?

[CDC]:  Yes.

MJ:  I am not trying your case, but I want to make sure because otherwise, I stopped her because of that concern.

[CDC]:  And I appreciate that, sir, and that's why I've come with the books that we discussed last time when we did the 39(a) with what I think is the appropriate information to cross-examination and examine her upon the terms of this issue.

MJ:  Okay.  I understand.

You are wanting to get into this particular area?

[CDC]:  Yes.

MJ:  Okay.  As long as we are clear on that particular point, because otherwise I would not allow the government to presented [sic] any information on false reporting.

[CDC]:  As long as it is general and educational.

MJ:  Well, the problem is it -- once you've opened the door, the door is open.  I have no idea what the government's going to do in return.

The CDC asked Dr. Horowitz about studies that showed false reporting rates in six to eight percent of child abuse allegations, and that with the hundreds of thousands of child abuse reports each year that would equate to at least six to eight thousand false reports. Dr. Horowitz acknowledged false reporting but maintained that most false reports are made by parents or other

adults, children rarely lied about child sex abuse, and when they did it was usually quite obvious.

Following the cross-examination of Dr. Horowitz, the members asked if Dr. Horowitz had interviewed AM and whether a tape existed of that interview.  The questions also generally explored Dr. Horowitz's opinions as to a child's recollection of earlier traumatic events.  When the CDC objected to these questions, the military judge responded:

> [Y]ou got into this area with your cross-examination, and that's why the members are asking the question is because [sic] you opened the door to that particular area.
>
> . . . .
>
> . . . You opened some fairly broad doors, and that's why I asked you the questions that I asked during our last 39(a) session after I dismissed the members.
>
> Because you were opening a very, very, very large door; one I would not have, without you specifically wanting to open up, allowed to be opened.  That door seems to have engendered a large number of questions on the part of the members that would not have been there but for you opening that door.

In response to the members' questions, Dr. Horowitz further discussed questions of false reporting and false allegations, as well as markers one might look for to detect such falsehoods. Again, the CDC objected, and again the military judge stated that the CDC had opened the door to these questions.  The military judge did, however, prevent Dr. Horowitz from

discussing whether she believed or disbelieved any particular witness.  He also told the members that it was their responsibility to "determine the credibility of the witnesses, and what the facts in [the] case are."  "No expert witness or other witness," the military judge said, "can testify that the alleged victim's account of what occurred is true or credible."

During closing arguments, the CDC returned to Dr. Horowitz's testimony.  He noted that even using conservative figures of the percentage of false reports, when applied to the very large number of reports of child sex abuse each year, would yield a large number of false reports.

> And, again, go back to that millions.  Even on the conservative figure it may not sound like a lot when you say 4 to 8 percent, but when you look at actual numbers and then you take into account what she, Dr. Horowitz, had to agree that, yes, adolescents can be good liers [sic].

B.  The Videotaped Interview with AM

There were two videotapes of interviews with AM; Dr. Horowitz did not participate in either interview, nor had she viewed the tapes of the interviews.  During their questioning of Dr. Horowitz the members requested to view the videotapes, and the CDC objected to the tapes admission on hearsay grounds.  The military judge considered whether the videotape could be seen as a prior consistent or inconsistent statement under Military Rule of Evidence (M.R.E.) 801(d)(1)(B) or M.R.E. 801(d)(1)(A); or as

a rebuttal of accusations of inconsistencies on the part of AM under M.R.E. 613.  Following review of the tape and a Rule for Courts-Martial (R.C.M.) 802 conference, the military judge admitted only one tape, as the other was determined to be irrelevant and to have been made after a motive to fabricate could have arisen.  Although portions of the videotape were found by the military judge to potentially be "subject to objection," neither party ultimately objected to the admission of the tape.  When he admitted the tape, the military judge told the members that it would be made available to them during deliberations.

In closing arguments, the CDC encouraged the members to review the videotape and compare the taped allegations to the statements AM made in court and elsewhere.  Summarizing the Government's case as one of "false allegation[s]" and "false report[s]," the CDC encouraged the members to "compare that video to what's been said in this room and what's been said at other times."  "Ask yourselves," the CDC continued, "does what she says in the video itself make sense and how inconsistent it is with what she now presents to you . . . ."

Finally, in the standard jury instructions, the military judge instructed the members that it was their responsibility to assess the credibility of the witnesses, and they could not rely on an expert witness to make that determination for them.

## III.  Discussion

### A.  Appellant's Arguments

Appellant argues that the CDC provided ineffective assistance of counsel (IAC) by (1) soliciting the testimony from Dr. Horowitz -- which the CDC characterized as "human lie detector testimony"; (2) failing to object to the admission of the videotape; and (3) allowing the videotape to be viewed during deliberations without supervision.

Appellant argues that these errors "were well beyond the range of reasonably, competent" assistance of counsel. Appellant argues that the CDC's performance was deficient as this Court's decisions indicate that "human lie detector testimony," or "credibility quantification testimony," is inadmissible as it invades the members' exclusive province of determining credibility and violates the rule that witnesses may only testify regarding a victim's character for truthfulness. United States v. Brooks, 64 M.J. 325, 330 (C.A.A.F. 2007). Appellant further argues that this alleged error by the CDC prejudiced Appellant as this was a case which turned on the credibility of Appellant's accuser.  There were no third-party witnesses to the alleged abuse and no corroborating physical evidence.  Furthermore, the military judge's instruction to the members regarding their limited use of Dr. Horowitz's testimony was not timely and was insufficiently specific as he did not

10

explicitly tell them to disregard the statistical evidence cited by Dr. Horowitz.

It was also error, Appellant asserts, for the CDC to fail to object to the admission of the videotaped interview as it was "devastating to Appellant's case." Appellant argues that proper foundation was not laid for the videotape, and it was hearsay. Furthermore, Appellant argues that the interview seen on the videotape did not support defense counsel's theory of fabrication as AM's statements on the videotape were not inconsistent with her later statements. Allowing the members to view the videotape during deliberations, Appellant argues, only compounded these errors, and additionally was error itself as the videotape ought to have been prohibited from the deliberation room.

## B. Analysis

To prevail on a claim of IAC, an appellant must show both that the counsel's performance was deficient and that the deficiency resulted in prejudice. United States v. Strickland, 466 U.S. 668, 687 (1984); United States v. Scott, 24 M.J. 186, 188 (C.M.A. 1987). Ultimately, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. A successful

ineffectiveness claim requires a finding of both deficient performance and prejudice; there is no requirement that we address "both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697. We review both prongs of the Strickland analysis de novo. United States v. Anderson, 55 M.J. 198, 201 (C.A.A.F. 2001); United States v. Wiley, 47 M.J. 158, 159 (C.A.A.F. 1997).

Our analysis of counsel's performance is highly deferential. Strickland, 466 U.S. at 689. We are not to assess counsel's actions through the distortion of hindsight; rather we are to consider counsel's actions in light of the circumstances of the trial and under the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). As a general matter, we "'will not second-guess the strategic or tactical decisions made at trial by defense counsel.'" Anderson, 55 M.J. at 202 (quoting United States v. Morgan, 37 M.J. 407, 410 (C.M.A. 1993)). Where, as here, an appellant attacks the trial strategy or tactics of the defense counsel, the appellant must show specific defects in counsel's performance that were "unreasonable under prevailing professional norms." United

States v. Perez, 64 M.J. 239, 243 (C.A.A.F. 2006) (citations and quotation marks omitted).

1) Dr. Horowitz's Testimony

Appellant relies on Brooks, 64 M.J. 325, for the proposition that it was error for the CDC to discuss the rates of false accusations of sexual abuse among child victims. In Brooks -- which post-dates the trial in this case -- we determined that testimony by an expert regarding the percentage of false claims of sexual abuse made by children was the "functional equivalent of vouching for the credibility or truthfulness of the victim." Id. at 326-27. We found that the testimony was the equivalent of human lie detector testimony and reversed. Id. at 326, 328-30.

There are key differences between this case and Brooks. The testimony in the instant case was not extracted by the Government, but rather by the defense itself. The defense specifically questioned Dr. Horowitz as to the rates of false reporting. The record clearly establishes that the CDC's theory of the case was that AM's testimony was fabricated and inconsistent. When the military judge questioned the CDC as to whether he truly wanted to pursue this line of argument, the CDC responded affirmatively. He specifically intended to question Dr. Horowitz whether child-accusations of sex abuse were reliable.

Given that this case was essentially a credibility contest between Appellant and his daughter, Appellant has not overcome the presumption that it was a reasonable strategic decision, under the circumstances of this case and prevailing professional norms, for the defense counsel to seek to establish that the daughter's testimony could be a false allegation. Appellant has failed to demonstrate that it was unreasonable, under the circumstances and prevailing professional norms, for counsel to argue that AM was lying in this specific case by citing evidence showing that among more than 100,000 reports there were at least six to eight thousand false reports. Further, defense counsel used the statistical testimony during closing argument to remind the court members that thousands of false reports occur every year, even using conservative estimates.

2)  Admission of the Videotape

Appellant asserts that admission of the videotape compounded the error created during the cross-examination of Dr. Horowitz, and it resulted in the members viewing the videotape during deliberations. Additionally, the CDC failed to preserve his objection to the admission of the videotape as hearsay, and failed to object to the admission of the videotape on foundational grounds.

Whether or not the videotape was properly authenticated or admitted, the question before us is whether counsel's

performance with regard to it was deficient.  It was not.  It was the CDC's strategy to have the members view the videotape and consider the testimony therein.  During his closing argument, the CDC advanced a theory that AM had fabricated her allegations and that her statements were inconsistent.  He asked the members to "Go back and at least start out and replay that video and compare that video to what was said in this room and what's been said at other times and see where that brings you."  Simply put, the videotape was part of the CDC's trial strategy -- a strategy that Appellant has failed to show was unreasonable under prevailing professional norms; whether Appellant now agrees with that strategy is beside the point.

3)  Viewing the Videotape during Deliberations

As noted above, the CDC obviously wished the members to view the tape during their deliberations, going so far as to specifically request that they do so.  Appellant cites R.C.M. 921(b) to argue that what evidence members may take into the deliberation room with them is limited.  But that rule states: "Unless otherwise directed by the military judge, members may take with them in deliberations their notes, if any, any exhibits admitted in evidence, and any written instructions." Id. (emphasis added).  As the videotape was admitted into evidence and the military judge specifically told the members

15

that they could view the tape during deliberations, there was no violation of R.C.M. 921(b).

It has been said that hard cases make bad law.  It may be said with equal truth that hard cases may make otherwise questionable trial tactics reasonable.  The CDC in this case had a difficult assignment:  to defend an accused whose daughter testified to repeated instances of abuse performed upon her, and whose wife testified to his admission to such abuse.  Attacking the credibility of this testimony and suggesting its fabrication was one of the few options the CDC had.  While a different defense counsel might have chosen different tactical steps, the tactics used were part of a trial strategy that Appellant failed to show was unreasonable under the circumstances and prevailing professional norms.  Because Appellant has not satisfied the first Strickland prong, we need not address the second prong.

## IV.  Decision

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.