**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Airman SEAN R. TAYLOR**
**United States Air Force**

**ACM 38247**

**30 April 2014**

Sentence adjudged 24 November 2012 by GCM convened at Sheppard Air Force Base, Texas.  Military Judge:  J. Wesley Moore.

Approved Sentence:  Dishonorable discharge, confinement for 5 years, forfeiture of all pay and allowances, and reduction to E-1.

Appellate Counsel for the Appellant:  Captain Christopher D. James.

Appellate Counsel for the United States:  Colonel Don M. Christensen; Lieutenant Colonel C. Taylor Smith; Captain Richard J. Schrider; and Gerald R. Bruce, Esquire.

Before

ROAN, HARNEY, and HECKER
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final release.

HECKER, Judge:

A general court-martial composed of officer members convicted the appellant, contrary to his pleas, of attempted wrongful sexual contact, aggravated sexual assault, forcible sodomy, burglary, and unlawful entry, in violation of Articles 80, 120, 129, and 134, UCMJ, 10 U.S.C. §§ 880, 920, 929, 934.[1]  The approved and adjudged sentence consisted of a dishonorable discharge, confinement for 5 years, forfeiture of all pay and

---

[1] The appellant was acquitted of a second specification of burglary.

allowances, and reduction to E-1.  The appellant raises four issues for our consideration: (1) Whether the evidence is legally and factually sufficient to sustain the appellant's conviction for aggravated sexual assault where the evidence did not show beyond a reasonable doubt that the victim was substantially incapacitated; (2) Whether the evidence is legally and factually sufficient to sustain the appellant's conviction for forcible sodomy where no evidence of penile penetration was presented; (3) Whether the military judge committed plain error by admitting the contents of a text message sent to the victim by a friend of the appellant; and (4) Whether trial defense counsel provided ineffective assistance of counsel when they failed to file a motion to compel a toxicology expert and when they allowed the appellant to concede his guilt during his unsworn statement.  Finding no error materially prejudicial to the substantial rights of the appellant, we affirm.

*Background*

The charges in this case stemmed from the appellant's contact with two women during December 2010, six months after he entered active duty.  The 19-year-old appellant went uninvited into the unlocked home of MR, a friend's mother, who was also an active duty Army Master Sergeant.  He got under the covers of her bed while she was sleeping, woke her up, and tried to convince her to have sexual intercourse with him while he tried to touch her breasts.  MR used her hands to keep him from touching her and told him to leave the bedroom.  The appellant eventually did so, but he returned and tried again.  MR testified that she was angry with him and found his actions irritating. For this incident, the appellant was convicted of attempted wrongful sexual contact and unlawful entry.

That same month, the appellant, a mutual acquaintance, and several others went to the apartment of CL, a 19-year-old civilian woman.  The group consumed alcohol and then went to a local nightclub.  After CL repeatedly vomited at the nightclub due to her alcohol consumption, her girlfriends brought her back to her apartment where she fell asleep in her bed.  The rest of the group also returned to her apartment.  Later that night, the appellant entered her room and engaged in sexual activity with her.  For this incident, the appellant was convicted of aggravated sexual assault, forcible sodomy, burglary, and unlawful entry.[2]

*Sufficiency of the Evidence*

The appellant contends the evidence is factually and legally insufficient to sustain his conviction for aggravated sexual assault against CL because the evidence did not show beyond a reasonable doubt that CL was substantially incapacitated at the time of

---

[2] The burglary and unlawful entry specifications were merged for sentencing purposes.

their sexual encounter. He also argues the evidence is similarly insufficient to convict him of forcible sodomy as no evidence was presented that the appellant's penis penetrated CL's anus. We disagree with both contentions.

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987), *quoted in United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence, [applying] neither a presumption of innocence nor a presumption of guilt [to] make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

"The test for legal sufficiency of the evidence is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.'" *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (quoting *Turner*, 25 M.J. at 324). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Our assessment of legal sufficiency is "limited to the evidence produced at trial." *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

As charged here, the Government's burden of proof for the aggravated sexual assault charge was to prove by legal and competent evidence, beyond a reasonable doubt, (1) that the accused engaged in sexual intercourse with CL, and (2) he did so when CL was substantially incapacitated. *See Manual for Courts-Martial, United States* (*MCM*), Part IV, ¶ 45.a.(c)(2) (2008 ed.). "Substantially incapacitated" is defined as:

> [T]hat level of mental impairment due to consumption of alcohol, drugs, or similar substance; while asleep or unconscious; or for other reasons; which rendered the alleged victim unable to appraise the nature of the sexual conduct at issue, unable to physically communicate unwillingness to engage in the sexual conduct at issue, or otherwise unable to make or communicate competent decisions.

Department of the Army Pamphlet 27-9, *Military Judges' Benchbook*, ¶ 3-45-5 (1 January 2010). Here, the Government was also required to prove beyond a reasonable doubt that CL did not consent to the sexual intercourse. For the sodomy specification, the Government was required to prove beyond a reasonable doubt that the appellant inserted his penis into CL's anus and did so by force and without her consent. *See MCM*, Part IV, ¶ 51.b.(1)-(4).

In addition to the testimony of CL, the Government presented testimony from several of the individuals who were at the apartment and nightclub with her and the appellant. All the witnesses were in their late teens at the time of the incident and most knew each other from their time in high school together in Wichita Falls, Texas. The group included two of CL's close girlfriends and a male friend. Those three knew the appellant as a fellow classmate from junior and senior high school. CL also invited a male friend, TG, whom she had known for a short time. TG brought along the appellant, a good friend of his from high school. CL had moved into town shortly before her senior year in high school but did not recall knowing or meeting the appellant while they were in school together.

On 23 December 2010, the group met at CL's studio apartment in order to drink alcohol before going to a local nightclub. CL was described as "pretty drunk" while at the apartment. None of the witnesses saw CL and the appellant talking or engaging in any flirtatious or romantic behavior any time that evening.

CL testified that she felt drunk but not sick when leaving her apartment, but began to feel sick soon after the group arrived at the nightclub. She recalled alternating between dancing (with individuals other than the appellant) and vomiting in the bathroom multiple times. Several of the other witnesses testified that CL had to be held up at times so she could continue dancing. Her friends later found CL on the floor of the bathroom, repeatedly vomiting. The appellant was standing nearby when one of the friends announced this fact to the larger group.

Several of the group picked CL up from the bathroom floor, helped her out of the nightclub, and placed her in a car. Her two girlfriends drove her home, while she sat in the car with her head between her legs. Upon arriving home, CL vomited by the curb. The two young women helped CL up the stairs to her apartment and removed her clothes because she was unable to do so herself. They put shorts and a shirt on her while she lay motionless with her eyes closed and then placed her in the bed (which was in a corner of the main room of the apartment and visible to those inside it). One of the friends testified that CL was the most intoxicated that she had ever seen her.

According to her testimony, CL's memory of the evening is spotty. She recalls her friends retrieving her from the bathroom floor, helping her walk out of the club, and putting her into a car. Her next memory is arriving at her apartment and vomiting outside the car door. She does not clearly recall how she got into her apartment, but remembers her two girlfriends changing her out of her clothes and placing her on her bed. She also recalls acquiescing when one of the friends asked if people could come to the apartment.

A short time later, the men, including the appellant, returned to the apartment. Witnesses said CL was sleeping or unconscious on the bed at this time. At one point, the

appellant and TG sat on the bed near CL and TG saw the appellant touch CL's arm or shoulder while she lay unresponsive. CL's two girlfriends also saw this and became uncomfortable because CL was passed out and they did not know the appellant. Another of the men told the appellant to "chill out" and stop what he was doing. Although the appellant protested that he was "helping her," he did stop.

Eventually, the appellant and TG left the apartment. TG testified that CL was still lying motionless in the bed when he left. The last individual left in CL's apartment was LS, her close girlfriend, who testified that she wanted to be the last to leave because the appellant's behavior that night was "creeping [her] out." When she left, LS testified that CL was "passed out" in the bed and unable to take care of herself. Because she did not have a key to the apartment, LS was unable to lock the door behind her.

Meanwhile, while the appellant was driving TG home, he indicated his belief that CL was interested in him, saying, "Dude, she wants me," and that he wanted to "bang" her. TG testified that he jokingly responded, "No, dude, she's obviously into me." When the appellant said he was going to go back to CL's apartment and check on her, TG told him that was not a good idea. Although the appellant told TG he would "probably just go home," TG texted CL a message that told her to "lock her door." TG testified that he did this as a precaution because he did not want the appellant returning to the apartment and getting into a confrontation with CL's male friend if he was still there and even if the male friend was not there, it still would not have been "good" for the appellant to be alone in the apartment with her.

CL testified that her first memory after she agreed that the others could return to her apartment was awakening and seeing the appellant sitting on her bed. CL testified that she felt "very groggy" and "still felt sick." She then recalls "com[ing] back into consciousness [and] feeling a lot of discomfort down in [her] vaginal area" and "waking up to [the appellant] having sex with [her]." CL testified that she did not consent to this sexual intercourse and that she would not have had this type of sexual contact with anyone after having been as sick as she was that night. When asked if she did anything at that time to communicate to the appellant that she did not want to have sex, she testified that she never told the appellant "no," but she did tell him that she was having her menstrual cycle as that "was the only thing [she] could think of to get across that this is not what [she] was wanting to happen" and it "was not okay with [her]." While the appellant was on top of her, she felt herself being anally penetrated. CL explained that she still felt very sick and was very confused, and could not fully understand how this situation had come about. After she passed out again, CL later re-awoke and became aware that she was on top of the appellant but did not recall doing anything to put herself in that position.

CL passed out again and awoke later. She saw light coming through the window and told the appellant he needed to leave. Her next memory was awakening at 0600

hours and noticing that the appellant was gone. Still feeling sick, she went back to sleep for several hours. At some point that morning, she saw the text on her phone from TG which told her to lock her doors. She soon told her two girlfriends about the incident, but did not contact law enforcement until her parents became aware of the situation a few weeks later.

As he did at trial, the appellant argues there was insufficient evidence to prove CL was substantially incapacitated. The defense conceded that CL was "tipsy" and "may have even been drunk," but that whatever alcohol she had in her system would have dissipated by the time of the sexual activity, due to the passage of time and her vomiting. Furthermore, the defense argues that (1) CL's awareness of the appellant's presence in her bedroom, and (2) their sexual activity demonstrate she was not substantially incapacitated, as did her contact with her friends early the following morning.

Having considered the entirety of the evidence presented at trial, we find the evidence factually and legally sufficient to sustain the appellant's convictions for committing an aggravated sexual assault on CL and forcibly sodomizing her. The evidence adduced at trial is sufficient to prove that CL was "substantially incapacitated" when the appellant began to engage in sexual intercourse with her. Based on eyewitness testimony, CL was extremely intoxicated that night, and unable to even care for her own basic needs. Moreover, her testimony showed continued mental impairment throughout the assault as she continued in and out of consciousness, unable to fully understand the situation. This incapacitation and mental impairment continued through CL being sodomized. Therefore, we similarly find the evidence factually and legally sufficient to convict the appellant of forcible sodomy. Although CL did not explicitly testify that it was the appellant's penis that penetrated her anus, based on her testimony and description of the incident, considering her mental impairment at the time, we are convinced that this is what occurred. We ourselves are convinced of the appellant's guilt of both offenses beyond a reasonable doubt. We also find that a reasonable factfinder could have found all the essential elements of these offenses beyond a reasonable doubt.

*Admission of a Text Message*

As described above, the appellant's good friend, TG, texted CL after he and the appellant left her apartment, telling her to "lock her door" but CL did not see this message until the next morning. The Government referred to this text message in its opening statement, but prior to it being admitted at trial, the defense objected during an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session contending it was inadmissible hearsay. Trial counsel claimed it was not hearsay as it was not being offered for the truth of the matter asserted within it and, if it was hearsay, then the "present sense impression" hearsay exception applied to the situation. The military judge overruled the defense objection after he concluded this text was neither a statement of fact nor an assertion and therefore did not constitute hearsay.

ACM 38247

On appeal, the appellant contends the military judge committed plain error when he found this evidence relevant to the issue of whether the appellant engaged in a sexual act with CL while she was substantially incapacitated. He further argues that even if such evidence is relevant, it should have been excluded pursuant to Mil. R. Evid. 403.

Because the trial defense counsel only objected on hearsay (and not relevancy or other grounds), we review this situation for plain error. *United States v. Datz*, 61 M.J. 37, 42 (C.A.A.F. 2005) (a party must "provide sufficient argument to make known to the military judge the basis of his objection and, where necessary to support an informed ruling, the theory behind the objection"); s*ee also* Mil. R. Evid. 103(a)(1) ("[A] timely objection [must be made] . . . stating the specific ground of objection, if the specific ground was not apparent from the context."). "Where an appellant has not preserved an objection to evidence by making a timely [and adequate] objection, that error will be forfeited in the absence of plain error." *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007) (citing Mil. R. Evid. 103(d)). The appellant has the burden of establishing (1) an error, that was (2) clear or obvious, and (3) resulted in material prejudice to his substantial rights. *Brooks*, 64 M.J. at 328.

The appellant concedes that his conversation with TG after leaving CL's apartment would be relevant at the trial, but argues that TG's later communication (via text message) with CL is not relevant.[3] He also argues that he was prejudiced because the panel members were "lured into" convicting the appellant because his best friend thought he was guilty.

Relevant evidence is "any evidence that has any tendency to make the existence of any fact that is of consequence . . . more probable or less probable than it would be without the evidence." Mil. R. Evid. 401. Generally, relevant evidence is admissible and evidence that is not relevant is not admissible. Mil. R. Evid. 402. The relevance standard is a low threshold. *United States v. Reece*, 25 M.J. 93, 95 (C.M.A. 1987). Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." Mil. R. Evid. 403.

Here, we do not find that the military judge committed plain error by failing to exclude the text message as irrelevant or as unduly prejudicial under Mil. R. Evid. 403. Two issues for the trier of fact in this case were how the appellant ended up back in CL's apartment and his motive for engaging in sexual activity with her. Evidence of TG's reaction to the appellant's comments about CL and his plans for her was relevant to these determinations. We further find that the probative value of this evidence is not

---

[3] On appeal, the appellant is not arguing that the military judge erred by finding the text message communication to be non-hearsay.

substantially outweighed by the danger of unfair prejudice. As such, the military judge did not commit plain error in admitting it.

*Ineffective Assistance of Counsel*

The appellant argues trial defense counsel's performance amounted to ineffective assistance of counsel. Specifically, the appellant claims his counsel were ineffective for failing to compel the Government to provide him with an expert in toxicology and for "allow[ing him] to concede guilt during his unsworn statement." After reviewing the record of trial, we find no merit to this argument.

We review claims of ineffective assistance of counsel de novo, applying the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007). Our superior court has applied this standard to military courts-martial, noting that "[i]n order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687; *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). The deficiency prong requires that an appellant show the performance of counsel fell below an objective standard of reasonableness, according to the prevailing standards of the profession. *Strickland*, 466 U.S. at 688. The prejudice prong requires a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In conducting this analysis, appellate courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. We "'will not second-guess the strategic or tactical decisions made at trial by defense counsel.'" *United States v. Anderson*, 55 M.J. 198, 202 (C.A.A.F. 2001) (quoting *United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993)).

Prior to trial, the Government denied the defense counsel's request for a forensic toxicologist to serve as a defense consultant. The defense did not renew that request before the military judge. The appellant now contends this constituted ineffective assistance of counsel because there was no tactical reason for this decision, given trial defense counsel's minimal knowledge of toxicology. In response to an order from this Court, trial defense counsel submitted declarations which explained they did not file a motion for an expert because (1) they had determined the expert would not assist the defense, based on their pretrial interview with him, and (2) it could cause the Government to employ their own expert who would provide damaging evidence against the appellant. These comprehensive declarations provide sound reasons for the decision now questioned by the appellant.

The appellant also complains that his trial defense counsel allowed the appellant to concede his guilt during his unsworn statement. In that statement, the appellant told the members:

I stand before you filled with shame and humility.

. . . .

[M]y actions off duty have wrecked any possibility that I will have a successful Air Force career.

. . . .

The most important thing I want to say is to [CL. CL,] I made a terrible, terrible mistake and I see that now. I don't know if it will help you to hear this, but I was not trying to hurt you. I wanted you to like me, and I let myself believe you did.

[CL], you deserved to be taken care of that night by your friends, and I wish I had acted like a true friend. I hope you can move on after this and have a full and happy life. I hurt other people too, as I have come to realize this week, listening to their testimony.

Ms. [MR], I thought highly of you. I apologize for my terribly inappropriate behavior. I know you have said you were fine and had to put it behind you, and I appreciate that much more than I can ever express. I am sorry I brought this on you.

The appellant argues his defense counsel were ineffective for allowing him to say this during the sentencing phase of his litigated court-martial, citing *United States v. Wean*, 45 M.J. 461 (C.A.A.F. 1997). In that case, our superior court discussed concessions of guilt during sentencing arguments:

[I]n general, when an accused has consistently denied guilt, a functional defense counsel should not concede an accused's guilt during sentencing, not only because this can serve to anger the panel members, but also because defense counsel may be able to argue for reconsideration of the findings before announcement of the sentence.

*Id.* at 464. At the time of the *Wean* trial, members were allowed to reconsider findings of guilty at any time before announcement of the sentence. *Id.* at 464 n.4. Currently, and at the time of this court-martial, Rule for Courts-Martial 924 allows members to reconsider findings only before they are announced in open court. *See also* Drafter's Analysis,

*MCM*, A21-71. With this change the rationale that lead to the *Wean* decision is weakened, as is the appellant's argument.

Additionally, in their declarations both counsel described the appellant's unsworn statement as emotional, sincere, and compelling. The military judge told the parties after trial that the appellant's unsworn statement was one of the best he had ever heard. The declarations also describe the defense counsel's strategy in preparing and presenting the defense sentencing case, including the unsworn statement, and in advising the appellant about these matters. Given this, we find the appellant has failed to meet his burden of demonstrating his trial defense counsel's conduct was deficient. Furthermore, he has failed to demonstrate any prejudice.

### *Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c); *Reed*, 54 M.J. at 41. Accordingly, the approved findings and sentence are

AFFIRMED.

FOR THE COURT

STEVEN LUCAS
Clerk of the Court

ACM 38247