# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39373**

————————————

## UNITED STATES
*Appellee*

**v.**

## William T. BALTAZAR
Airman Basic (E-1), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 17 June 2019

————————————

*Military Judge:* Shelly W. Schools (arraignment); John C. Degnan.

*Approved sentence:* Bad-conduct discharge, confinement for 10 months
and 15 days, forfeiture of $500.00 pay per month for 12 months, and a
reprimand. Sentence adjudged 2 October 2017 by GCM convened at Nel-
lis Air Force Base, Nevada.

*For Appellant:* Lieutenant Colonel Garrett M. Condon, USAF; Major
Meghan R. Glines-Barney, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Mi-
chael T. Bunnell, USAF; Mary Ellen Payne, Esquire.

Before MAYBERRY, HUYGEN, and MINK, *Appellate Military Judges.*

Judge MINK delivered the opinion of the court, in which Chief Judge
MAYBERRY and Senior Judge HUYGEN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as
precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

MINK, Judge:

A military judge sitting as a general court-martial convicted Appellant, in
accordance with his pleas and pursuant to a pretrial agreement (PTA), of two

specifications of wrongful use of a controlled substance (marijuana and methamphetamine) on divers occasions and five specifications of wrongful possession of a controlled substance (marijuana, 3,4-methylenedioxymethamphetamine, Tramadol, lysergic acid diethylamide, and cocaine) in violation of Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a.[1] The military judge sentenced Appellant to a bad-conduct discharge, confinement for 12 months, forfeiture of $500.00 pay per month for 12 months, and a reprimand. Recognizing Appellant's substantial assistance to law enforcement in the investigation of other military members, the convening authority approved only 10 months and 15 days of confinement but otherwise approved the sentence as adjudged.[2]

On appeal, Appellant asserts that he received ineffective assistance of counsel because his trial defense counsel failed to adequately consider and advise Appellant on speedy trial issues; to properly advise Appellant regarding the PTA; to properly prepare Appellant for and to assist with the guilty plea inquiry; and to properly prepare Appellant's sentencing case.[3] We find no prejudicial error and affirm the findings and sentence.

## I. BACKGROUND

This court-martial was Appellant's second. His first court-martial resulted from a urinalysis in June 2016, when Appellant's urine tested positive for Dextroamphetamine (DAMP), Methylenedioxyamphetamine (MDA), and 3,4-

---

[1] Unless otherwise noted, all references in this opinion to the Uniform Code of Military Justice and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] The PTA between Appellant and the convening authority provided that the latter would not approve a dishonorable discharge or any confinement in excess of 12 months, but contained no other limitation on the sentence that could be approved. Therefore, the PTA had no impact on the convening authority's ability to approve the adjudged sentence.

[3] Although not raised as an assignment of error by Appellant, the staff judge advocate's recommendation erroneously advised the convening authority that the maximum confinement Appellant faced was 5 years, even though the maximum confinement that could have been imposed by the court-martial was 26 years. We find the error plain and obvious. However, Appellant has not asserted and we do not find any colorable showing of possible prejudice from the error. *See United States v. Scalo*, 60 M.J. 435, 436–37 (C.A.A.F. 2005). Under the facts of this case, we are confident that stating the proper maximum confinement would not have led to a more favorable recommendation by the staff judge advocate or further clemency by the convening authority. *See United States v. Green*, 44 M.J. 93, 95 (C.A.A.F. 1996).

methylenedioxymethamphetamine (MDMA, also commonly referred to as "ecstasy"). On 9 January 2017, Appellant pleaded guilty to the wrongful use of ecstasy. His approved sentence from that court-martial was seven days of confinement, two months of hard labor without confinement, forfeiture of $500.00 pay for one month, reduction to the grade of E-1, and a reprimand. On 6 April 2017, one day prior to Appellant's involuntary separation from the Air Force as a result of his first court-martial conviction, the Air Force Office of Special Investigations (AFOSI) initiated an investigation into new drug offenses allegedly committed by Appellant, and his pending administrative discharge was cancelled. The new investigation was based on information AFOSI had received from another Airman (also being investigated for drug use) that Appellant had used marijuana and cocaine and that Appellant was then storing those substances in his on-base dormitory room. AFOSI obtained a search authorization for Appellant's dormitory room and his urine.

Executing the search authorization, AFOSI agents seized substances from Appellant's dormitory room that were later identified as marijuana and Tramadol, a Schedule IV controlled substance. Appellant's urine was collected on 6 April 2017 and tested positive for DAMP, Dextroamphetamine/Methamphetamine (DMETH), and tetrahydrocannabinol (THC), the metabolite of marijuana. The level of DAMP in Appellant's urine measured at 8,579 nanograms per milliliter (ng/mL), exceeding the Department of Defense (DoD) cutoff of 100 ng/mL. The level of DMETH in Appellant's urine measured at 41,928 ng/mL, exceeding the DoD cutoff of 100 ng/mL. The level of THC in Appellant's urine measured at 40 ng/mL, exceeding the DoD cutoff of 15 ng/mL.

Appellant stipulated to the following facts: at various times between late March and late April 2017, Appellant contacted a civilian drug dealer living in Las Vegas, Nevada, and arranged for the purchase of ecstasy, marijuana, lysergic acid diethylamide (LSD), and cocaine. Appellant would usually travel off base to the civilian dealer's residence to purchase the drugs and then bring them back to Nellis Air Force Base (AFB) to use. On one occasion, Appellant purchased what he believed was cocaine from the civilian dealer. However, by the time of his court-martial and based on his urinalysis results, Appellant believed the cocaine he thought he purchased either was mixed with methamphetamine or was just methamphetamine alone.

The day after the search of Appellant's dormitory room on 6 April 2017, he was placed in pretrial confinement (PTC). Subsequently, on 14 April 2017, the PTC review officer released Appellant from confinement and Appellant was immediately restricted to Nellis AFB.

In the early morning hours of 23 April 2017, while still restricted to base, Appellant and another airman used marijuana in the vicinity of abandoned dormitories on the base and were subsequently apprehended by security forces

(SF). During an inventory of Appellant's personal possessions, SF personnel discovered a small square foil wrapper with a suspicious red substance that was later tested and confirmed to contain LSD, cocaine, and ecstasy. Appellant's urine sample from that night tested positive for DAMP, DMETH, and THC. By the time of his court-martial and based on the results of his urinalysis, Appellant believed that when he had previously used ecstasy purchased off-base by the other Airman, it contained methamphetamine.

Following Appellant's apprehension, he was again placed into PTC on 23 April 2017. The original charge and four specifications addressing Appellant's use and possession of drugs were preferred on 12 May 2017 and referred on 5 June 2017. On 21 June 2017, AFOSI published its report of investigation (ROI) relating to Appellant's more recent offenses and included the test results from the foil wrapper and Appellant's urinalysis on 23 April 2017 that indicated additional misconduct not included in the original charge and specifications. On 28 June 2017, the original charge and its specifications were withdrawn and dismissed. A new charge was preferred on 13 July 2017, adding three additional specifications to the four originally preferred on 12 May 2017.

The new charge and its seven specifications were referred and served on Appellant on 8 August 2017. Appellant was arraigned on 10 August 2017 after waiving the five-day waiting period and was then tried by general court-martial on 2 October 2017.

## II. DISCUSSION

### A. Law

The Sixth Amendment[4] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001) (citation omitted). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984) (citation omitted). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). Accordingly, we "will not second-guess the strategic or tactical decisions made at trial by defense counsel." *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (quoting *United States v. Anderson*, 55 M.J. 198, 202 (C.A.A.F. 2001)).

We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza*, 67 M.J. at 474). We

---

[4] U.S. CONST. amend. VI.

utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Gooch*, 69 M.J. at 362 (alteration in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

## B. Analysis

Appellant asserts his trial defense counsel, Major (Maj) SH,[5] failed to provide him effective assistance of counsel in four specific respects. Appellant's arguments are supported in part by a declaration he submitted to the court. At the Government's request, the court ordered Maj SH to submit a declaration addressing Appellant's claims. Maj SH's declaration generally does not contradict Appellant's assertions of fact but rather explains the strategic and tactical decisions made before and during the trial by the Defense. However, with respect to the preparation of Appellant's sentencing case, Maj SH directly contradicts Appellant's assertion of certain facts. We have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes and are convinced that such a hearing is unnecessary. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967). We address Appellant's four assertions in turn.

### 1. Speedy Trial

Appellant first contends that his trial defense counsel failed to develop a strategy regarding Appellant's speedy trial rights and failed to advise him of the existence of Article 10, UCMJ, 10 U.S.C. § 810. Appellant acknowledges that his trial defense counsel discussed with him the "120-day rule" contained in Rule for Courts-Martial (R.C.M.) 707, but claims that his trial defense counsel expressed uncertainty both as to whether the speedy trial protection afforded by the rule had been violated (because Appellant had been released from PTC for a period of time) and as to how a military judge might decide a motion

---

[5] Maj SH was a captain at the time of trial.

alleging a violation of R.C.M. 707. Appellant asserts that he would have proceeded differently if he had been made aware of the protection afforded by Article 10, UCMJ:

> Depending on the circumstances, I would have demanded a speedy trial, I would have refused to consent to waiving the five-day waiting period [between service of the charges on Appellant and arraignment], and I would have either made speedy trial motions under Article 10[, UCMJ] and the 120-day rule or held onto those motions as leverage.

Appellant stated his belief that his trial defense counsel was unaware of the speedy trial protection afforded by Article 10, UCMJ.

Not surprisingly, Maj SH's declaration described his representation of Appellant as well as his evaluation of the speedy trial issue in Appellant's case much differently. Maj SH had not represented Appellant at his first court-martial and began representing Appellant in May 2017 after Appellant was already in PTC. In June 2017, Maj SH submitted to the Government a discovery request that included a demand for speedy trial. Maj SH stated that, during his first conversation with Appellant, Appellant indicated that he wanted "to take responsibility for his actions, while facing the least amount of punishment possible."

Maj SH stated that he then began investigating Appellant's case and exploring the possibility of a PTA with the legal office. Maj SH learned that Appellant faced increased criminal exposure depending on the results of pending laboratory tests and that the legal office responded with something "akin to incredulity that [Appellant] believed he was in any position to do anything but plead guilty without any bargain." Maj SH then sought to leverage Appellant's knowledge of misconduct by other military members to obtain a favorable PTA. Despite the initial lack of interest by the legal office in a PTA, Maj SH continued to seek PTA negotiations with the legal office as the investigation into Appellant's offenses continued.

In his declaration, Maj SH stated that while he initially advised Appellant of the benefits of accepting a PTA, his advice changed after the Government dismissed the original charge and its specifications, based at least in part on his evaluation of the speedy trial issues and the possible suppression of evidence. Maj SH stated that he advised Appellant of his speedy trial rights under R.C.M. 707, Article 10, UCMJ, and the Fifth[6] and Sixth Amendments to the United States Constitution. Maj SH discussed with Appellant the possibility of motions to dismiss based on violation of speedy trial rights and to suppress

---

[6] U.S. CONST. amend. V.

evidence that could have resulted in a full dismissal of the charge and all specifications if both motions were successful. According to Maj SH, Appellant's "preference was for a quicker resolution to his case, so he could begin to move forward as quickly as feasible." Appellant, therefore, preferred to enter into a PTA.

Maj SH described his continuing efforts to negotiate a PTA as well as his efforts to explore a speedy trial motion. Regarding the latter, he explained:

> I consulted with several other Defense counsel, including a member of the appellate defense division. I provided an overview of the dates applicable to double check my assessment of the RCM 707 'clock' and what, if any, portions of Article 10, or the 5th and 6th amendments might apply. I was consistently concurred with that applicable case law, even a plain reading of RCM 707 revealed no violation. Further, despite the consistent statement that 'Article 10' was dead, it was difficult to see how the government moved without reasonable diligence. Among other reasons, the active negotiation of some type of pretrial agreement, the intervening circumstances of [Appellant's] subsequent misconduct, as well as additional evidence that led to the addition of more charges. Finally, it was, in large part, due to Defense Counsel's availability. Given that my schedule would lead to two additional months in pretrial confinement, I offered [Appellant] [sic] release me and I could seek a counsel that would be available at a sooner date. [Appellant] declined the offer.

> In terms of why the RCM 707 motion was unlikely to garner success – as an initial matter, any fair reading of RCM 707 and associated cases related to RCM 707 indicate the preference to try cases together. Given that there was alleged misconduct that occurred in late April [2017], that was the date that effectively controlled the analysis. In conjunction with the above dates, should there be any violation, it would likely have been a dismissal without prejudice given what appeared to be good faith PTA discussions between the government and the defense.

Maj SH also specifically recalled discussing Article 10, UCMJ, with Appellant and the fact that it did not matter "which date is used in terms of when restraint was imposed, the government had already 'violated' it, or arraignment would happen prior to the 120 day clock" and "arraignment would not have significant consequence to any other speedy trial considerations." The Defense submitted three PTA offers with various limitations on sentence and forum before the fourth and final one was signed by the parties on 18 September 2017.

We do not need to determine whether Appellant's or Maj SH's recollection of the discussion, or lack thereof, of speedy trial protection under Article 10, UCMJ, is correct. Even assuming Appellant's assertions of fact are correct, we are not persuaded that the trial defense counsel's approach to the investigation, analysis, and resolution of the potential speedy trial issues in Appellant's case amounted to performance measurably below that expected of fallible lawyers. *See Gooch*, 69 M.J. at 362 (citation omitted). Despite Appellant's belief to the contrary, Maj SH's declaration clearly establishes that he understood and explored the issue of speedy trial in Appellant's case. The uncontroverted portions of Maj SH's declaration on the issue of speedy trial clearly establish that he assessed and researched the viability of the speedy trial issues in Appellant's case, going so far as to consult with other defense counsel and even an appellate defense counsel. Further, as made clear in the record of trial, Maj SH specifically informed the military judge that a speedy trial motion was one that he had considered in the preparation of Appellant's case, determined was not case dispositive, and that was not being raised. The military judge questioned Appellant about the potential speedy trial (and the possible suppression of evidence) motion and the possibility that one or both could result in dismissal of the specifications in the case. Appellant acknowledged that he was aware of those potential motions but was choosing to proceed with the PTA with the knowledge that his PTA required the waiver of all motions that could be waived.[7]

We also find it unnecessary to analyze whether Appellant might have been successful on a motion to dismiss for a violation of his speedy trial rights. Based on the evidence before the court, we find the actions of trial defense counsel with respect to the investigation and evaluation of the issues of speedy trial fall squarely within the realm of reasonable strategic and tactical decisions that we are not disposed to "second-guess" on appeal. *See Mazza*, 67 M.J. at 475 (citation omitted). We therefore do not find trial defense counsel's performance "measurably below" that expected of defense counsel with regard to speedy trial. *See Gooch*, 69 M.J. at 362 (citation omitted).

### 2. PTA and Decision to Plead Guilty

Appellant next contends that, if he knew before his court-martial what he has learned since his court-martial, he would not have entered into the PTA and that his guilty plea pursuant to the PTA was "improvident." Appellant

---

[7] The PTA between Appellant and the convening authority contained a general provision requiring Appellant to waive all motions that could be waived under current legal precedent and public policy. The PTA did not specifically address the waiver of a motion based on a speedy trial violation.

blames the "terrible" PTA on his trial defense counsel's "ineffective job of explaining to [him his] options as well as trying to negotiate a pretrial agreement." Appellant claims that from the beginning of the trial defense counsel's representation, he felt pressure to plead guilty with a PTA; that the PTA "did virtually nothing to assist [him] and agreeing to those terms was irrational"; and that the "chances of being sentenced to a dishonorable discharge or more than 12 months confinement were infinitesimally small," referring to the sentence limitation in the PTA. Appellant concludes by stating, "Knowing what I know now, had I been fully informed of my options and the reasonable sentencing range for my charges, I would not have opted to agree to that pretrial agreement."

Maj SH attempted to negotiate a PTA favorable to Appellant over a period of several weeks. Maj SH described his efforts as follows:

> [W]ith the legal office/Convening authority otherwise unwilling to compromise, some deal was better than no deal. The offered PTA of what essentially amounted to the sentence cap of a Special Court-Martial was agreed to. By the time there was a signed PTA – 4 PTAs had been submitted. Submissions included a 10 months cap and withdrawal of the Tramadol specification; not to refer the case to [General Court-Martial]; to refer the case back to a [Special Court-Martial]; and the final approved PTA. The prior PTAs were either directly rejected by the Convening Authority, rendered moot by the withdrawal of charges, or withdrawn by [Appellant's] choice because the legal office advised it would be rejected.

> [Appellant] entered into the final PTA partially against my advice. Though initially, I recommended to him that the PTA was the best option to avoid additional charges and a more severe forum, once the case was withdrawn, I changed my recommendation. I advised [Appellant] that he had two very viable motions available to him – related to suppression of evidence and potential speedy trial violations under RCM 707, Article 10, and the 5th and 6th Amendments. If both were successful, they would effect, in essence, a different half [sic] the specifications, and lead to a full dismissal. However, if one, or both were unsuccessful, [Appellant] would be in effectively the same place. [Appellant's] preference was for a quicker resolution to his case, so he could begin to move forward as quickly as feasible. The guarantee was of greater value.

Maj SH described his efforts to research and evaluate the speedy trial issues in Appellant's case prior to providing Appellant with final advice on the

fourth and final PTA offer. Maj SH did not detail his final advice to Appellant regarding acceptance of the PTA, but stated that, throughout his representation of Appellant, Appellant's "expressed priority was to find a way to resolve the case, so he could do his time and leave."

Whatever second thoughts Appellant may now have about his PTA, we do not find that trial defense counsel's strategy of pursuing a PTA constituted ineffective assistance of counsel. Appellant acknowledged that trial defense counsel advised him on several occasions of the advisability of having a "safety net" in the form of a PTA rather than pleading guilty without the benefit of a PTA. Clearly, in a general court-martial with a maximum imposable sentence that included a dishonorable discharge and confinement for 26 years, the sentence limitation of a bad-conduct discharge and 12 months of confinement that could be approved by the convening authority constituted a benefit to Appellant. In addition, the record of trial makes it clear that Appellant signed the PTA with a full understanding of what the PTA meant and how it benefited him. During the inquiry by the military judge, Appellant explicitly stated that he had consulted with his trial defense counsel and was satisfied with the advice of his trial defense counsel.

There is a reasonable explanation for Maj SH's negotiating the PTA and advising Appellant to agree to it. We further find that the record is devoid of any evidence that the performance of the trial defense counsel with respect to the negotiation of the PTA or advice provided to Appellant regarding the PTA fell below that expected of defense counsel or that any such allegedly deficient performance denied Appellant the reasonable probability of a more favorable outcome.

### 3. Guilty Plea Inquiry

Appellant next asserts that his trial defense counsel did not properly prepare him for his guilty plea inquiry and failed to "orient" Appellant to the details of each specification, which resulted in Appellant "disclosing uncharged misconduct as well as matters in aggravation." According to Appellant, his guilty plea inquiry was "disastrous" and, because he was not prepared for his guilty plea and disclosed misconduct previously unknown to the Government, he was punished more severely.

In Maj SH's declaration, he explained:

> [M]y main concern with [Appellant] was every specification carried with it significant amounts of aggravation, uncharged misconduct, *and* additional crimes with greater exposure. . . . [Appellant] frequently had issues keeping track of what substances he believed were being purchased and what was actually obtained. We agreed that the focus [of the guilty plea inquiry]

should limit explicit details to avoid significantly more aggrava-
tion, or the appearance of dishonest testimony under oath. The
strategy was to keep his discussion of the offenses as tight and
narrow as possible. We discussed, repeatedly, to consult fre-
quently during the inquiry if needed. A primary goal, if not most
significant goal, was to prevent any information other than use
or possession from being disclosed or discovered. It was not part
of the strategy to disclose an additional use, however, it fit
within the larger strategy of using the stipulation of fact and a
limited [guilty plea inquiry] to minimize far greater exposure.

Appellant's argument that he was not adequately prepared for the guilty
plea inquiry focuses on the military judge's questioning of Appellant regarding
possession of ecstasy between 6 April 2017 and 23 April 2017. In response to
the military judge's questions, Appellant began discussing possession and use
of ecstasy near the beginning of the charged timeframe rather than on or about
23 April 2017 when Appellant was found in possession of the foil wrapper that
later tested positive for ecstasy. As the colloquy between the military judge and
Appellant continued, it became apparent that Appellant was discussing an in-
stance of possession and use of ecstasy different from the one charged and un-
related to the foil wrapper seized on 23 April 2017. After clarification that Ap-
pellant was discussing an uncharged possession and use of ecstasy, Maj SH did
not object to the military judge considering the multiple instances of ecstasy
possession as a matter in aggravation. Even so, the military judge made it clear
on the record that he would not increase the sentence based on Appellant's
admission of uncharged misconduct:

[Military Judge]: So, I want you to understand that if I accept
your guilty plea and we move into the sentencing part of this
case, the government will present evidence. You may present ev-
idence; you may not. But I am subject to the same instructions
that I would give those members, if you had gone in front of
members, and I will follow the same instructions. So, the fact
that you've admitted multiple possessions to me, I will not en-
hance your punishment or hold that against you in any way,
other than to acknowledge that you have admitted to more than
one possession, okay?

[Appellant]: Yes, sir.

Having reviewed the guilty plea inquiry in its entirety, we are not per-
suaded that trial defense counsel failed to adequately prepare Appellant for
the guilty plea inquiry. On the whole, Appellant gave consistent answers to the
military judge's questions and provided a substantial factual basis upon which
the military judge could find Appellant guilty of the charged offenses without

11

providing evidence of other criminal conduct. Appellant consulted often with trial defense counsel during his questioning by the military judge. Given the various drugs possessed by Appellant on various dates, it is not surprising that Appellant admitted to uncharged misconduct when explaining a charged offense. However, when we consider the trial defense strategy outlined by Maj SH to limit Appellant's exposure for other, more serious crimes, we cannot conclude that trial defense counsel's performance specifically with regard to Appellant's guilty plea to ecstasy possession fell measurably below that expected of defense counsel.

Additionally, it is clear that the military judge did not increase Appellant's punishment as a result of Appellant's disclosure of additional, uncharged possession and use of ecstasy. Even if trial defense counsel had failed to adequately prepare Appellant for the guilty plea inquiry, any such failure that resulted in the disclosure of uncharged misconduct was not prejudicial and did not deny Appellant the reasonable probability of a more favorable outcome.

### 4. Defense Sentencing Case

Appellant also asserts Maj SH failed to investigate, develop, and present a defense sentencing case. Appellant claims that he provided Maj SH with the names of several military members to contact for character statements and that Appellant was unaware the Government would likely have paid for a sentencing witness to be brought to Nellis AFB to testify on his behalf. Further, Appellant asserts that his parents would have traveled to Nellis AFB at their own expense to testify on his behalf "had they and [Appellant] known that was an option" and that they and other family members and friends would have written character statements on Appellant's behalf. According to Appellant, Maj SH told him "that it was better that [the Defense] did not have any [character statements]." Appellant believes that Maj SH did not contact any of the people whose names Appellant provided. Appellant also states, incorrectly, that he had no written, personal statement. In fact, Appellant's sentencing case consisted of a brief, written unsworn statement with a page of photographs attached and an eloquent, verbal unsworn statement.

Maj SH directly contradicts Appellant's assertions in several key respects. First, Maj SH stated that although he offered to contact a member of Appellant's family, Appellant specifically directed Maj SH not to do so because "his family had already gone to great lengths for [Appellant] at his previous trial and he was too embarrassed to even have them know what he had done." Second, Maj SH stated his efforts to seek out members of Appellant's unit who could say positive things about Appellant were met with similar resistance from Appellant. Third, Maj SH stated that it was Appellant's decision to present a brief, written unsworn statement and focus on his oral unsworn statement.

Despite the disparity between Appellant's and Maj SH's versions of what occurred in the preparation and presentation of Appellant's sentencing case, we need not decide which is more credible. Even assuming Appellant's version of events is accurate, we find that the evidence Appellant might have been able to present—positive character statements discussing his attitude, rehabilitation potential, etc.—would have had little impact on Appellant's sentence under the particular circumstances of this case.

As noted above, this was Appellant's second court-martial for drug use in less than 10 months. Appellant had a varied and extensive history of drug use and possession that continued despite his previous court-martial for drug use, processing for administrative separation from the Air Force, or PTC and then restriction to base. Appellant provided this court with no information to support his assertion that statements about his good character could have been obtained by Maj SH. We are not persuaded that any number of character statements from friends, family, and co-workers would have convinced the military judge to impose a lesser sentence in this case. We are further skeptical of Appellant's claim of ignorance about obtaining character statements and witness testimony in light of Appellant's previous experience being tried by a court-martial.

There was a reasonable explanation for Maj SH's handling of the sentencing case and his level of advocacy did not fall measurably below the performance ordinarily expected of a fallible lawyer. Even if it had, there is no reasonable probability that, absent the error, there would have been a different result in Appellant's sentence. The bad-conduct discharge and 12 months of confinement imposed by the military judge equated to the jurisdictional limit of a special court-martial. Accordingly, we find that Appellant's claim of ineffective assistance of counsel must fail. Not finding error by Maj SH, we also do not find a cumulative effect of errors that warrants relief.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court