# UNITED STATES NAVY–MARINE CORPS
# COURT OF CRIMINAL APPEALS

———————————

**No. 201600337**

———————————

## UNITED STATES OF AMERICA

Appellee

v.

## BRIAN J. GARDINER

Chief Air Traffic Controller (E-7), U.S. Navy

Appellant

———————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Captain Robert J. Crow, JAGC, USN.
Convening Authority: Commander, Navy Region Southeast, Naval Air Station, Jacksonville, FL.
Staff Judge Advocate's Recommendation: Lieutenant Commander George W. Lucier, JAGC, USN.
For Appellant: Gary Myers, Esq.; Lieutenant Commander William L. Geraty, JAGC, USN.
For Appellee: Lieutenant George R. Lewis, JAGC, USN; Lieutenant Megan P. Marinos, JAGC, USN.

———————————

Decided 28 December 2017

———————————

Before HUTCHISON, FULTON, and SAYEGH, *Appellate Military Judges*

———————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

———————————

HUTCHISON, Senior Judge:

At a contested general court-martial, a panel of officer and enlisted members convicted the appellant of two specifications of aggravated sexual abuse of a child and three specifications of sexual assault of a child, in violation of Articles 120 and

120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2008) and 10 U.S.C. § 920b (2012), respectively. The members sentenced the appellant to 25 years' confinement, total forfeiture of pay and allowances, reduction to pay grade E-1, and a dishonorable discharge. The convening authority approved the sentence as adjudged.

The appellant initially raised a single assignment of error: that he received ineffective assistance from his defense counsel. In a supplemental filing, the appellant raised three additional assignments of error pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): that the appellant was subjected to a prejudiced panel with inflamed passions; that a Naval Criminal Investigative Service (NCIS) Agent testified to facts outside the scope of her knowledge; and that the government violated 18 U.S.C. § 3500 (the "Jencks Act") by failing to disclose statements made by government witnesses to a family advocacy counselor. We have considered the appellant's three supplemental assignments of error and find them to be without merit. *United States v. Clifton*, 35 M.J. 79 (C.M.A. 1992). We therefore discuss in detail only whether the appellant was denied effective assistance of counsel. Having carefully considered the record of trial and the parties' submissions—including the declarations submitted by the appellant and the affidavit submitted by the trial defense counsel (TDC)—we conclude the findings and sentence are correct in law and fact and find no error materially prejudicial to the appellant's substantial rights. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

The appellant was convicted of sexually abusing his stepdaughter, HS, beginning in 2011, and continuing until 2014, when HS was between 13 and 15 years old. HS testified that the abuse began when the appellant was stationed in Bremerton, Washington and then escalated after the family moved to Pensacola, Florida. Over the course of several months, the appellant had sexual intercourse, oral sex, and anal sex, with HS in various rooms of their house onboard Naval Air Station (NAS) Pensacola, Florida, in the appellant's truck while parked in various locations onboard the installation, at the appellant's workplace, and at the on-base Navy Gateway Inn and Suites (NGIS).

In addition to HS, the government called JG—the appellant's wife and HS's mother. JG described an incident where she was awakened by her dog scratching on HS's bedroom door, got up to let the dog into HS's room, and realized the appellant was in the room. JG initially claimed she could not see anything because it was dark. But after being confronted with a statement she made to NCIS investigators, JG admitted that she knew the appellant was in the room and asked him "what was going on?"[1] JG conceded she thought it was strange for the appellant to be in HS's

---

[1] Record at 449.

room. But, according to JG, the appellant told her that he was simply rubbing HS's back because she wasn't feeling well, and that JG was "sick" to even think anything inappropriate was occurring.[2]

The government also admitted a receipt showing that the appellant paid for a one-night stay at the NAS Pensacola NGIS for 5 July 2013[3] and photos of the various rooms in the appellant's home, photos of his truck, and photos of his work center. Notably, the appellant's work center had unique ceiling tiles. Each tile was emblazoned with a painting representing a different command and the name of the various air traffic controllers assigned to the command. HS testified that she saw a ceiling tile from one of the appellant's previous commands with the appellant's name on it when the appellant took her to his work center to have sex with her.[4]

The defense's case-in-chief consisted of a single exhibit—a diagram of the appellant's NAS Pensacola home used during cross-examination of HS—and a single witness. The witness was one of the appellant's co-workers who testified that she gave HS a tour of the appellant's work center and specifically pointed out the various ceiling tiles, unique to the work center. Following the witness testimony the defense rested.

On appeal, the appellant submitted a declaration under penalty of perjury contending that he was told by his TDC that he was going to testify but was not adequately prepared to do so. The declaration then alleges that, once at trial, the TDC would not let the appellant testify. In addition to the appellant's declaration, the appellate defense counsel attached declarations from witnesses the TDC declined to call at trial.

Following our 31 August 2017 order, the TDC submitted an affidavit responding to the allegations contained in the various declarations submitted on behalf of the appellant.[5]

## II. DISCUSSION

The appellant avers that his trial defense counsel were ineffective because they failed to call multiple witnesses who were "available to testify and who would have been pivotal to the defense," and then denied the appellant his right to testify in his

---

[2] *Id.* HS had previously testified about this encounter. According to her, the appellant was having vaginal intercourse with her when JG opened the door and then closed it "like really quickly[,]" before the appellant "jumped up immediately" and went downstairs to talk to a crying JG. *Id.* at 337-38.

[3] *See* Prosecution Exhibit (PE) 7.

[4] *See* PE 6 at 5.

[5] *See* Appellee's Motion to Attach filed on 8 Sep 2017, Affidavit of LCDR PH of 8 Sep 2017.

own defense.[6] We review ineffective assistance of counsel claims *de novo*. *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015).

The Sixth Amendment entitles criminal defendants to representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). The Court of Appeals for the Armed Forces (CAAF) has applied this standard to courts-martial, noting that "[i]n order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J 360, 361 (C.A.A.F. 2010) (citations omitted). A counsel's performance is deficient if "that counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In order to show prejudice under *Strickland*, "[t]the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

When an ineffective assistance claim is raised by a post-trial declaration, we apply the six principles established in *United States v. Ginn* to determine whether we can decide the case without further fact-finding:

> (1) if the facts alleged in the affidavit allege an error that would not result in relief even if any factual dispute were resolved in the appellant's favor, the claim may be rejected on that basis;

> (2) if the affidavit does not set forth specific facts but consists instead of speculative or conclusory observations, the claim may be rejected on that basis;

> (3) if the affidavit is factually adequate on its face to state a claim of legal error and the Government either does not contest the relevant facts or offers an affidavit that expressly agrees with those facts, the court can proceed to decide the legal issue on the basis of those uncontroverted facts;

> (4) if the affidavit is factually adequate on its face but the appellate filings and the record as a whole compellingly demonstrate the improbability of those facts, the court may discount those factual assertions and decide the legal issue;

> (5) when an appellate claim of ineffective representation contradicts a matter that is within the record of a guilty plea, an appellate court may decide the issue on the basis of the appellate file

---

[6] Appellant's Brief of 3 Apr 2017 at 2-3 and 7-8.

and record (including the admissions made in the plea inquiry at trial and appellant's expression of satisfaction with counsel at trial) unless the appellant sets forth facts that would rationally explain why he would have made such statements at trial but not upon appeal; and

(6) the Court of Criminal Appeals is required to order a fact-finding hearing only when the above-stated circumstances are not met.

47 M.J. 236, 248 (C.A.A.F. 1997). With this legal framework in mind, we examine each of the appellant's claims.

**A. Failure to call witnesses**

"A trial defense counsel's decision on whether to call a witness is a tactical decision." *Akbar*, 74 M.J. at 390 (citations omitted). Strategic or tactical decisions made by counsel will not be second-guessed on appeal unless the appellant shows specific defects in performance that were unreasonable under prevailing professional norms. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009). Therefore, in order to prevail, the appellant has the heavy burden of establishing that his TDC's tactical decision to forego calling witnesses was unreasonable. *See United States v. Datavs,* 71 M.J. 420, 424 (C.A.A.F. 2012) (Trial defense counsel performance is not deficient "when [he] make[s] a strategic decision to accept a risk or forego a potential benefit, when it is objectively reasonable to do so)" (citation omitted); *see also United States v. Adams,* 59 M.J. 367, 370 n.5 (C.A.A.F. 2004) ("An appellant's burden is heavy because counsel is presumed to have performed in a competent, professional manner").

Applying the third *Ginn* factor, the declarations submitted by potential defense witnesses on behalf of the appellant are adequate to state a claim of legal error and the TDC's affidavit does not contest the substance of the declarants' proffered testimony. Rather, the TDC's affidavit offered reasonable explanations for his decisions not to call each declarant as a witness. Consequently, we find, without the need for further fact-finding, that the appellant has failed to establish either deficient performance or prejudice. We review each of the appellant's assertions below.

*1. Failure to call members of the appellant's family*

The appellant contends that the collective testimony of his wife, JG, his mother, SG, and the appellant's stepson, AS—all of whom knew the appellant and HS well and observed them closely—could have established reasonable doubt. JG asserts in her declaration that, had she been asked during cross-examination, she would have testified that in her opinion, her daughter, HS, was not a truthful person, and that

HS "can be highly manipulative of others."[7] The declarations of AS and SG generally assert they observed nothing out of the ordinary between the appellant and HS.

The TDC's affidavit explains his rationale for not calling JG in his case in chief or cross-examining her regarding HS's character for truthfulness: he was concerned that putting JG on the stand to "accuse her daughter of being a liar, when the government was arguing that JG was covering for [the appellant] for monetary reason (sic)" would cause additional harm to the defense.[8] Additionally, the TDC noted that JG would routinely change her answers when they spoke to her and they did not want to risk putting her on the stand and having her say something for which they were unprepared. We find nothing unreasonable about this decision.

Likewise, the TDC explained that calling AS to testify would also have caused harm to the defense. Specifically, HS and her friend, BR, each testified that the appellant forced AS to watch pornography. Putting AS on the stand would have opened the door to questions about the appellant providing pornography to a minor. Moreover, since AS was not called to testify, the TDC was able to forcefully argue that the government had failed to call AS, despite the fact that his bedroom was right next to HS's.[9]

Finally, we find nothing objectively unreasonable about the TDC's tactical decision not to have SG testify. SG was the appellant's mother, did not live with the appellant and HS, and only observed their interactions during short visits to Pensacola and during a six-week period when the appellant and his family stayed with her while transferring from Bremerton, Washington to Pensacola. In his affidavit, the TDC stated that he did not believe SG's testimony added much value and noted that SG was "understandably very emotional during the trial."[10]

Moreover, the TDC was concerned that calling SG would emphasize the unexplained single night hotel stay from 5 July 2013. SG confirmed in her reply to the TDC's affidavit that she and her husband stayed in the NAS Pensacola NGIS

---

[7] Appellant's Motion to Attach filed 3 Apr 2017, Declaration of JG of 12 Feb 2017 at 2.

[8] Affidavit of LCDR PH at 2.

[9] *See* Record at 624 ("They did not bring him to you. Why? Ask yourself why.").

[10] Affidavit of LCDR PH at 2. Although SG denies that she was emotional in her reply, *see* Appellant's Motion to Attach filed 26 Sep 2017, Declaration of SG of 25 Sep 2017 at 1, we do not find this to be a factual dispute requiring further fact-finding pursuant to *Ginn*. Rather, whether someone is "emotional" is an opinion on which reasonable persons may disagree. The TDC also did dispute SG's assertions that he "was rushing to get [the appellant's] court-martial over with so he could be at another court-martial[.]"Appellant's Motion to Attach filed 3 Apr 2017, Declaration of SG at 2. Applying *Ginn's* second factor, we reject this "speculative or conclusory" observation. *Ginn*, 47 M.J. at 248.

when they came to visit the appellant, but did not stay at the NGIS on that date.[11] The government originally sought to introduce receipts for all of the appellant's NGIS bookings in order to depict 5 July 2013 as an outlier—a single night stay amid several other lengthier visits.[12] The TDC successfully objected on relevance grounds and the military judged excluded all of the receipts except for the one corresponding to 5 July 2013. The TDC's theory regarding that date hinged on HS's testimony that when she left the NGIS after the appellant had sex with her, it was around 1730 and dark outside. The TDC argued that because sunset was much later than 1730 on 5 July 2013, the sexual assault could not have happened at the NGIS the way HS described it, and therefore, she was fabricating her story.[13] The TDC, otherwise, had no explanation for the 5 July 2013 NGIS receipt. Calling SG to testify would have confirmed for the members that she and her husband did not stay at NGIS on that night, and would have highlighted that the defense had no explanation for the NGIS receipt—and possibly opened the door to the additional NGIS information.

Accordingly, we find the TDC's decisions not to call JG, SG, or AS to be reasonable and decline to second-guess his trial strategy. *United States v. Paxton,* 64 M.J. 484, 490 (C.A.A.F 2007) (citing *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006)).

*2. Failure to call expert*

The appellant claims that the TDC erred by failing to call an expert psychologist employed by the defense, Dr. MW, during both the merits phase of the trial and during sentencing. We will examine both claims.

According to Dr. MW's declaration, had he been called to testify on the merits, he would have explained that HS's "sexual precociousness" was just as likely the cause of her knowledge of oral, vaginal and anal intercourse, and of various sexual positions, as was any sexual contact with the appellant.[14] Dr. MW would have further explained that HS's precociousness was not normative behavior, but could have been caused by pressure exerted by boys with whom she was sexually active. The TDC was concerned, however, that putting Dr. MW on the stand would subject him to cross-examination about the appellant's alleged "grooming behavior, gifts, escalation of touching . . . that we did not want before the members."[15] Likewise, the

---

[11] *See* Declaration of SG of 25 Sep 2017 at 1 ("[A]ll of the hotel room dates were explained. There was just one night that my husband and I did not know about.").

[12] *See* Record at 534-44; Appellate Exhibit (AE) XXXIV.

[13] *See* AE XXXV. The military judge took Judicial Notice that sunset on 5 July 2013 was at 1955.

[14] Appellant's Motion to Attach filed 3 Apr 2017, Declaration of Dr. MW of 21 Feb 2017 at 2.

[15] Affidavit of LCDR PH at 4.

TDC was concerned that putting Dr. MW on the stand might open the door to evidence that HS was cutting herself—evidence that the TDC had successfully suppressed. In addition, the fact that HS was sexually active was already before the members and the TDC did not believe Dr. MW's testimony would have helped establish reasonable doubt. We do not find the TDC's reasoned decision to forego having Dr. MW testify to be objectionably unreasonable given the potential harm it might have caused.

Regarding sentencing, Dr. MW would have testified that the appellant had a low likelihood for reoffending, that five to ten years in a controlled environment "would be more than sufficient to provide insight and skills acquisition" to prevent reoffending, and that the appellant demonstrated the "capacity for self-control."[16] While Dr. MW notes in his declaration that the TDC thought his test results could be misinterpreted by the members, Dr. MW disagreed because "[he] could have explained why the test results were favorable, as they predict a low likelihood of recidivism."[17] The TDC confirmed in his affidavit that he was concerned the results would be misinterpreted by the members, or that the government would have been able to use the results against the appellant. Specifically, the TDC noted in Dr. MW's report several "possible personality diagnoses that would have harmed our sentencing case."[18] We apply "a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. TDC's decision here to forego calling Dr. MW during the appellant's presentencing case was made after a thorough discussion with both Dr. MW and attorneys from the Navy's Defense Counsel Assistance Program.[19] We find no basis to conclude the TDC's course here was unreasonable. *Paxton,* 64 M.J. at 490.

*3. Failure to call HS's boyfriend*

According to his declaration, IMJ dated HS during the charged period and would have testified that he and HS were sexually active, that he was caught by the appellant "throwing pebbles at [HS's] window" in the middle of the night to get her attention, that HS never told him she was being molested by the appellant, and that he never observed anything that suggested the appellant was abusing HS.[20] IMJ also indicated in his declaration that he "was never contacted *to testify"* at the

---

[16] Declaration of Dr. MW at 2.

[17] *Id.*

[18] Affidavit of LCDR PH at 4.

[19] The Defense Counsel Assistance Program provides "advice and assistance to trial defense counsel in the field when requested throughout every phase of court-martial litigation." Commander, Naval Legal Service Command Instruction 5800.1G §1200 at 12-1 (25 Feb 2013).

[20] Appellant's Motion to Attach filed 3 Apr 2017, Declaration of IMJ of 16 Feb 2017 at 1.

appellant's court-martial.[21] While the appellant contends in his brief that his "defense counsel failed to investigate or even contact [IMJ], an obvious and available witness," there is no support for such an assertion in IMJ's declaration.[22] Rather, IMJ simply declared that he was never contacted *to testify at the court-martial*. Indeed, in his uncontroverted affidavit, the TDC explained that he interviewed IMJ, was concerned about IMJ's recollection of his encounter with the appellant when he was caught throwing pebbles at HS's window, and decided "not to request him at trial."[23] Again, we find nothing unreasonable about this tactical decision, given the limited value of IMJ's testimony.

We hold that the choices made by the TDC were reasonable under the facts of this case and will not engage in the "intrusive hindsight analysis of the very sort that *Strickland* warned against." *United States v. Curtis*, 44 M.J. 106, 125 (C.A.A.F. 1996). In any event, any potential errors in not calling the potential witnesses were not "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. None of the witnesses would have rebutted the government's theory that the appellant sexually assaulted HS in private, and as noted *supra*, their testimony could have, instead, caused significant harm to the appellant's case.

**B. Right to testify**

The right to testify is constitutionally protected and belongs exclusively to the accused. *United States v. Belizaire*, 24 M.J. 183, 184-85 (C.M.A. 1987). In his post-trial declaration, the appellant asserts that although the TDC told him he was going to testify, he only spent one hour with his attorneys preparing for his testimony prior to trial. At trial, after the TDC finished with the sole defense witness, the appellant claims his attorneys "took [him] to a room in the back of the court-room" where he was told he was not being called to testify because he would "do more harm than good."[24] According to the appellant, he told the TDC, "If I am going to go down for [expletive] I didn't do, then I want to take the stand[,]" but the TDC simply replied, "We are not calling you. You are not ready for cross-examination[.]"[25]

In his affidavit, the TDC states that he conducted two separate practice sessions with the appellant, totaling approximately seven hours, where both the TDC and

---

[21] *Id.* (emphasis added)

[22] Appellant's Brief at 13.

[23] Affidavit of LCDR PH at 3. The TDC explained that according to IMJ, the appellant yelled and became physical with him, and the TDC was concerned about how the members might misconstrue the appellant's actions.

[24] Appellant's Motion to Attach filed 3 Apr 2017, Appellant's Declaration of 15 Feb 2017 at 1-2.

[25] *Id.*

assistant defense counsel asked the appellant questions they expected the government to ask on cross-examination. The TDC then told the appellant before trial "that it would be better . . . if he did not testify, because we did not think he would do well under cross examination and would do more harm than good to his case, but we had to wait and see how the evidence came out at trial."[26] Then after the government rested its case, the TDC met with the appellant in the defense witness room and "asked him point blank 'are you good with not testifying' and he said he trusted us."[27] Finally, the TDC asserts that after he called his one witness, and before he rested, he once again leaned over and asked the appellant "are you good," and the appellant responded that he was.

In the appellant's reply to the TDC's affidavit, he concedes that his defense counsel conducted two "mock trials" but maintains that together they amounted to only about an hour's worth of prep time. The appellant also denies that the TDC ever asked him if he was "good" before resting.

Despite these conflicting accounts, we need not order a hearing to resolve this aspect of the appellant's claim, because, mindful of *Ginn's* fourth factor, these matters may be resolved based on the "appellate filings and the record." *Ginn,* 47 M.J. at 248. Indeed, in *United States v. Dewrell* the CAAF relied upon *Ginn* to examine an ineffective assistance of counsel claim with remarkably similar facts to the case before us. 55 M.J. 131 (C.A.A.F. 2001).

*Dewrell* claimed that despite his desire to testify, his civilian defense counsel simply rested without presenting any evidence and without discussing it with him. *Id.* at 134. Although the appellant and his counsel presented differing accounts of their conversations, the CAAF looked to the record and recognized that: (1) there was a two-hour break after both parties rested, followed by an Article 39(a), UCMJ, session in which Dewrell could have made known his desire to testify; (2) there was no indication Dewrell rejected his counsel's advice; and (3) Dewrell made no complaint about his defense counsel in any post-trial submission to the convening authority. *Id.* at 135. The CAAF concluded that Dewrell's "failure to speak up at or after trial belies his assertion that his desire to testify was improperly cut off by his counsel." *Id.* So too here.

The record reflects that after the government rested, the court recessed for approximately 23 minutes—which corresponds to the TDC's assertion that he met with the appellant during a recess following the close of the government's case.[28] In an Article 39(a), UCMJ, session held immediately following the recess, the TDC informed the military judge that he intended to call one witness and then rest. After

---

[26] Affidavit of LCDR PH at 5.

[27] *Id.* at 6.

[28] *See* Record at 543.

the witness testified, the defense rested. The record does not indicate whether a brief pause and conference took place between the appellant and the TDC before the defense rested. However, the record does reflect a nearly three-and-a-half hour break after both sides rested, followed by another Article 39(a), UCMJ, session. Like the appellant in *Dewrell*, the appellant here had ample opportunity to make known his desire to testify. But the appellant said nothing about wanting to take the stand during either Article 39(a), UCMJ, session, or during the lengthy recess, and did not mention being deprived of his right to testify in his unsworn statement during sentencing. The appellant also made no complaint about the TDC during post-trial clemency and does not now assert that the TDC's representation during clemency was deficient. Therefore, we agree with our superior court:

> This barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing . . . . Some greater particularity is necessary—and also we think some substantiation is necessary, *such as an affidavit from the lawyer who allegedly forbade his client to testify*—to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim[.]

*Id.* at 135 (emphasis in original) (internal quotation marks and citations omitted). Consequently, we conclude, as did the CAAF in *Dewrell*, that the "the appellate filings and the record as a whole compellingly demonstrate the improbability" of the appellant's assertions. *Ginn*, 47 M.J. at 248. Setting aside the appellant's assertions as improbable, the appellant has offered no other evidence that his counsel ignored or overrode his desire to testify. Without such evidence, the appellant's claim fails. Accordingly, the appellant has not raised sufficient grounds to rebut the presumption that the TDC was effective in representing him.

### III. CONCLUSION

The findings and sentence are affirmed.

Judge FULTON and Judge SAYEGH concur.

For the Court

R.H. TROIDL
Clerk of Court