# UNITED STATES AIR FORCE
## COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39848**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Tyler D. COOVERT**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 21 July 2021

————————————

*Military Judge:* Charles G. Warren.

*Sentence:* Sentence adjudged on 4 October 2019 by GCM convened at Grand Forks Air Force Base, North Dakota. Sentence entered by military judge on 22 November 2019: Dishonorable discharge, confinement for 2 years and 6 months, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant:* Major Alexander A. Navarro, USAF; Carol A. Thompson, Esquire.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before MINK, KEY, and ANNEXSTAD, *Appellate Military Judges*.

Judge ANNEXSTAD delivered the opinion of the court, in which Senior Judge MINK and Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

ANNEXSTAD, Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of sexual assault in violation of Article

120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] The court-martial sentenced Appellant to a dishonorable discharge, confinement for two years and six months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority took no action on the findings or sentence.

Appellant raises four issues for our consideration: (1) whether trial defense counsel were ineffective for failing to move to suppress Appellant's statement to Air Force Office of Special Investigations (AFOSI) agents and for failing to adequately cross-examine the victim;[2] (2) whether trial counsel committed prosecutorial misconduct by introducing and arguing irrelevant information and improperly appealing to the members' emotions to convict Appellant; (3) whether Appellant's conviction is legally and factually sufficient; and (4) whether the military judge abused his discretion by failing to conduct an in-camera review on a motion to compel production under Mil. R. Evid. 513. Following our initial review of this case we specified a fifth issue for consideration: (5) whether Appellant is entitled to appropriate relief because the convening authority failed to act on Appellant's request for deferment of his reduction in rank as required by Rule for Courts-Martial (R.C.M.) 1103(d)(2).

With respect to issue (4), we have carefully considered Appellant's contentions and find it does not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Finding no error materially prejudicial to a substantial right of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

On 29 January 2019, LS and KS drove to a house occupied by Senior Airman (SrA) NM. LS and KS had been friends since the summer of 2018. Appellant and SrA NM were friends, and at that time, Appellant was staying at SrA

---

[1] Appellant also pleaded not guilty to two additional specifications of sexual assault in violation of Article 120, UCMJ. The first specification was dismissed without prejudice after arraignment but before trial, and Appellant was found not guilty of the second specification. Both specifications referred to 2018 offenses, *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*)). Appellant was convicted of a sexual assault that occurred after 1 January 2019 and elected to be tried by the sentencing rules in place prior to 1 January 2019. Unless otherwise noted all references to the UCMJ and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Portions of the trial transcript, appellate exhibits, and briefs addressing issues (1) and (4) were sealed pursuant to R.C.M. 1113. These portions of the record and briefs remain sealed, and any discussion of sealed material in this opinion is limited to that which is necessary for our analysis. *See* R.C.M. 1113(b)(3).

NM's house. All four individuals knew each other and had spent time together at a local bar the previous weekend. Appellant had previously commented to KS that he thought LS was "cute." He had also mentioned to SrA NM that he found LS attractive and was interested in her. KS and LS intended to "hang out" with Appellant and SrA NM that night, but did not intend to spend the night.

Over the course of the evening the group sat around a table talking and playing drinking games. As KS testified, the "point" of the drinking game was to "drink more often." All four individuals consumed alcohol throughout the night. LS estimated that over the course of the night she had anywhere from three to eight drinks. The group was interacting and drinking for about four to five hours. At one point during the evening Appellant asked LS out on a date. LS told Appellant that she would be willing to go out with him.

Later in the evening SrA NM and KS spent time with each other in SrA NM's bedroom, leaving Appellant and LS in the living room. When they returned to the living room, Appellant and LS were still sitting at the table. Eventually, SrA NM and KS went back to his bedroom to sleep. SrA NM woke up about two hours later and started to walk to the living room to turn off the television. He was stopped in the hallway by Appellant, who told him to "go back to sleep" or he "was going to ruin this for him." SrA NM went back to his bedroom and went to sleep.

Appellant and LS continued to hang out and talk in the living room. LS was on her phone, texting a friend. Appellant eventually told LS to get off of her phone. LS testified that she stayed on her phone because she "didn't want a reason to get any closer" to Appellant and wanted to maintain a physical distance. Appellant became a little more aggressive and "snippy" and made a few snide remarks about LS being on her phone. At one point Appellant told LS that she "wasn't a celebrity" and that "there wasn't that many people she needed to talk to."

LS was mostly texting with her ex-boyfriend, EW. They had an on-again, off-again relationship, and though they were not dating at this time, LS wanted to return to having a relationship with EW. In one text to EW, LS told him that she was uncomfortable, and she wanted EW to pick her up. In another text to EW, LS stated that she was scared and shared her location so he knew where she was. LS was also sending EW quotes of things Appellant was saying to her. For instance, she told EW that Appellant had said to her "If you ignore me one more time, I am going to do what I want." After a while, LS told Appellant that she wanted to go home. Appellant began bargaining with LS, telling her that if she put down her phone for two minutes, he would drive her home. At this point in the night, LS was feeling scared and out of control. Appellant was being verbally aggressive with her, and she was in an unfamiliar house. LS

acknowledged that although she was scared and uncomfortable, Appellant had not done anything physical toward her at that point, but had just expressed anger generally.

LS eventually put her phone down and moved over to the couch next to Appellant to watch television. Appellant then kissed LS on the cheek a few times. LS did not reciprocate initially. Her initial response was to start crying, and she testified that she had tears running down her face. Appellant's only reaction was to tell her that "it's fine." At one point, LS did kiss Appellant back, hoping that would make him stop. Appellant then pulled her pants down while still telling her that she "was fine." LS later told the police there was a point when Appellant was holding her down, and she was telling him "no," that she did not like what he was doing, but Appellant continued to say she was "fine." Appellant then pulled down his own pants, and inserted his penis into LS's vagina. Appellant began thrusting, while LS cried and remained motionless. At some point, while Appellant's penis was still in LS's vagina, he asked her why she was crying. Appellant then continued to thrust for some amount of time, at least 15 seconds but no more than a few minutes, before he stopped, got off of LS, and put his pants back on. LS immediately texted EW, "F[**]k you he just raped me."

Appellant then drove LS to her mother's house. During the car ride, Appellant took out his phone and told LS that people had "tried to get him in trouble with this type of thing before" so he needed to record her saying that she had consented to having sex with him. LS testified that she was scared and panicked, and told him that they could talk about it when they were both sober, LS went into her mother's house and immediately told her mother what had happened. LS's mother then called the police.

At about 0430 that morning, a civilian police officer, PE, received a dispatch to respond to a report of a sexual assault. PE reported to LS's mother's house, where he found LS sitting on the bathroom floor, distraught and crying. PE was wearing a body camera that recorded his interactions with LS.[3] PE testified that when he first made contact with LS she was crying so hard that it was difficult for her to form words to respond to his questions. Eventually LS reported that Appellant had sexually assaulted her and she and the officer agreed that she should go to the hospital. The officer told her to bring her cell phone and the clothes she was wearing to the hospital, and he took pictures of the text messages between LS and EW that were on her phone.

---

[3] The bodycam video was admitted into evidence as Prosecution Exhibit 2 and was played for the members at trial.

At the hospital, LS met with a sexual assault nurse examiner, KM. KM conducted a sexual assault forensic examination (SAFE) on LS. The SAFE included taking swabs of LS's neck, the outer area around her vagina, her vaginal wall, and her cervix. The swabs were then provided to law enforcement for deoxyribonucleic acid (DNA) testing. At trial, KM was recognized as an expert in the field of sexual assault forensic examination, and she testified that when she first came into contact with LS that LS was very "upset" and "tearful." KM also noted that LS had mascara running down her face.

Meanwhile, after dropping LS off at her mother's house, Appellant returned to SrA NM's house and knocked on the door to SrA NM's bedroom. When KS answered the door, Appellant said that he needed to talk to her. KS followed Appellant to the living room, where Appellant told KS that he had driven LS somewhere, and that she seemed upset. He stated that LS had been crying. He told KS that he and LS had been kissing, but did not say anything about having sex with her. He then asked KS if she knew why LS would have been upset. Appellant told KS that he had recorded LS in the car, though he did not explain why. Around the time that LS was with police, Appellant also sent a message to LS through Instagram, a social media application, asking her why she would not talk to him.

Later that morning, after KS left, Appellant spoke with SrA NM about the night. He told SrA NM that he and LS had been making out when she started crying and "got hysterical" about her mother's illness. Appellant said that after LS became upset, they stopped what they were doing and he drove her home. Appellant indicated to SrA NM that he had been hoping to have sex with LS, but did not say that they had. At trial, SrA NM opined, based on their friendship, that if Appellant had sex with LS, Appellant would have told him.

On 22 March 2019, Appellant was interviewed by AFOSI Special Agent (SA) TW. After waiving his rights, Appellant made the following statement concerning his interaction with LS:

> [LS] and her friend came over. We invited them to come over and have some drinks. They come over [sic], and we played some like drinking games, like Kings Cup and stuff like that. And as the night went on, a couple of hours I would say we played. And then [SrA NM] and the girl that he invited went off to his room. And me and [LS] hung out there by ourselves for a little while. We drank a little more and watched some TV. We started kissing and stuff like that, and things were progressing. And then as we were kissing, things heated up like they do when you are kissing and stuff like that, some clothes started to come off. And then, before anything like actually got going, like she started crying

> and mentioned something I think about her mom, and then asked if I could take her home.

At trial the Government called LS's ex-boyfriend EW and her former roommate PB as witnesses. Both testified that LS is an honest and truthful person. Additionally, the Government presented testimony from DD, a forensic DNA examiner from the United States Army Criminal Investigation Laboratory. DD was recognized as an expert in the field of DNA analysis. DD stated that he performed the DNA analysis on the swabs taken from LS at the hospital and also analyzed swabs collected from Appellant. DD stated that he used the Y-STR DNA test which detected a male DNA profile on the vaginal swabs. DD testified that Appellant could not be excluded from the male DNA profile discovered on the outer vaginal swab, the vaginal swab, or the cervical swab. He stated that the probability of a random male individual's DNA being present with that particular profile was one in 1,111 for caucasian individuals. DD testified that his findings were consistent with Appellant's penis penetrating LS's vulva.

At trial, Appellant was also charged with sexually assaulting another woman, Airmen First Class (A1C) SG. Appellant was acquitted of that offense.

## II. DISCUSSION

### A. Allegations of Ineffective Assistance of Counsel

Appellant alleges that he was denied effective assistance of counsel. He asks this court to consider two specific deficiencies in the performance of his trial defense counsel: (1) failure to move to suppress Appellant's statement to AFOSI agents, and (2) ineffective cross-examination of LS.

#### 1. Law

The Sixth Amendment[4] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). "Our scrutiny of a trial defense counsel's performance is 'highly deferential,' and we make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

---

[4] U.S. CONST. amend. VI.

challenged conduct, and to evaluate conduct from counsel's perspective at the time.'" *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (omission in original) (quoting *Strickland*, 466 U.S. at 689).

We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475 (citation omitted). "Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citing *Gooch*, 69 M.J. at 362–63). The burden is on the appellant to demonstrate both deficient performance and prejudice. *Id.* (citation omitted).

We consider the following questions to determine whether the presumption of competence has been overcome: (1) if an appellant's allegations are true, is there a reasonable explanation for counsel's actions; (2) did defense counsel's level of advocacy fall measurably below the performance ordinarily expected of fallible lawyers; and (3) if defense counsel was ineffective, is there a reasonable probability that, absent the errors, there would have been a different result. *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991) (citations omitted); *Gooch*, 69 M.J. at 362. Considering the last question, "[i]t is not enough to show that the errors had some conceivable effect on the outcome," instead it must be a "probability sufficient to undermine confidence in the outcome," including "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Datavs*, 71 M.J. at 424 (internal quotation marks and citations omitted).

**2. Analysis**

In response to Appellant's assignment of error, we ordered and received declarations from both trial defense counsel.[5] We have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes between Appellant's assertions and his trial defense team's assertions. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967). We find a hearing unnecessary to resolve Appellant's claims. Considering these declarations along with the as-

---

[5] On 9 April 2021, the United States Court of Appeals for the Armed Forces denied Appellant's petition for extraordinary relief in the nature of writ of prohibition or, in the alternative, a writ of mandamus, seeking to prohibit this court from compelling affidavits from Appellant's trial defense counsel. *See Coovert v. United States*, __ M.J. __, No. 21-0207, 2021 CAAF LEXIS 315 (C.A.A.F. 9 Apr. 2021).

sertions Appellant makes in his assignment of error, we conclude that Appellant has not overcome the presumption of competence of his trial defense counsel.[6] We examine each allegation in turn.

### a. Motion to Suppress

Appellant specifically asserts that he did not provide a voluntary and knowing waiver to his rights under Article 31, UCMJ, 10 U.S.C. § 831, and claims his counsel were deficient in failing to move to suppress his statement to AFOSI agents. Appellant claims he was prejudiced because his statement "played a crucial role in the government's case." Appellant's lead defense counsel, Major (Maj) NL, explained in his declaration that this was not a failure, but "a strategic and tactical choice," and he elaborated on the rationale behind the decision:

> Besides [Appellant]'s statement to [AFOSI], there was no other statement from him regarding what occurred on the night in question between him and [LS]. Given the swift report to police and the compelling "body-cam" footage of [LS], we felt strongly that [Appellant] was going to have to get his version of events in front of the panel in some form or another. This conclusion left us with only two viable defense options in our opinion: 1. Move to suppress [Appellant]'s [AFOSI] statement and recommend that he take the stand and testify as to the events in question; or 2. Allow his [AFOSI] statement to be admitted, frame it as a general denial of any wrongdoing, and argue the reasonable inference from [Appellant]'s statement "before anything *like* actually got going" is that what he meant was that the sex did not last very long.

Maj NL, further explained that their trial strategy also had to account for the fact that Appellant was being "accused by not one, but two women on two separate occasions." He also explained that factoring into their "calculus was the military judge's ruling that he would allow the Government to argue a 'common scheme' theory between the two allegations despite our objection." Therefore, Maj NL stated that it was his professional recommendation that Appellant "not testify in the case due to what would likely be a withering cross-

---

[6] We considered the declarations to resolve this issue pursuant to *United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F. 2020) (observing a Court of Criminal Appeals is allowed to accept affidavits "when necessary for resolving claims of ineffective assistance of trial defense counsel . . . when those claims and issues are raised by the record but are not fully resolvable by the materials in the record").

examination wherein trial counsel would try to link commonalities between the two women and catch [Appellant] in an untenable position."

Maj NL also discussed that they were well aware that DNA evidence would likely "be admitted" and that the Government was likely "to argue that [Appellant's AFOSI] statement was contradicted by the DNA evidence." Maj NL stated that it was his position the Appellant's statement would only be contradicted by the DNA evidence if it was assumed that Appellant's statement was in fact a categorical denial that no sex had occurred between him and LS, which he believed was not the case. We note that Maj NL argued consistent with this position during his findings argument.

In sum, Maj NL explained:

> Our decision regarding the use or suppression of [Appellant's AFOSI] statement, whether or not he should testify, and the interplay of these considerations with the DNA evidence were all part of a deliberate trial strategy that we believed gave [Appellant] the best chance to prevail at trial.

Finally, Maj NL states that this strategy was discussed with Appellant and that he "wholeheartedly" agreed. This assertion finds some support in the record. We note that after the Government rested, the military judge conducted an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session with Appellant. There he specifically advised Appellant regarding his right to testify and Appellant acknowledged on the record that he understood his right to testify and stated that it was his decision to "not testify, sir."

Because trial defense counsel articulated strategic reasons for not moving to suppress Appellant's statement to AFOSI that are objectively reasonable, it is unnecessary to discuss the merits, or lack thereof, of such a motion, had one been made. We will not second guess the trial defense strategy. *Mazza*, 67 M.J. at 475 (citation omitted). We evaluate defense counsel's performance not by the success of their strategy, "but rather whether counsel made . . . objectively reasonable choice[s] in strategy from the alternatives available at the [trial]." *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001) (quoting *United States v. Hughes*, 48 M.J. 700, 718 (A.F. Ct. Crim. App. 1998)) (additional citation omitted), *aff'd*, 52 M.J. 278 (C.A.A.F. 2000). There are reasonable explanations for trial defense counsel's actions and advice, and their individual and combined level of advocacy on Appellant's behalf was not "measurably below the performance ordinarily expected of fallible lawyers." *Polk*, 32 M.J. at 153. We also note that Appellant was acquitted at trial of a second sexual assault specification, so the strategy employed by the defense team was partially successful. We conclude Appellant has failed to meet his burden to demonstrate deficient performance.

### b. Cross-examination of LS

Appellant next claims his trial defense counsel should have more thoroughly cross-examined LS about a statement that she made to KN, namely, that EW was "crazy" and that she said "no" to Appellant out of fear of EW. Appellant alleges that this additional avenue of cross-examination would have shored up an argument that he and LS engaged in consensual sex, and that shortly after inserting his penis into her vagina, LS "began to freak out that somehow, someway, EW would find out that she was having sex with another guy."

Maj NL explained that their cross-examination strategy of LS

> was designed to simultaneously achieve two related goals: synching [Appellant]'s version of events as told to the [AFOSI] as closely as possible with [LS's] version of events; and establishing that the sexual encounter between [Appellant] and [LS] began consensually and was terminated when she suddenly and unexpectedly began crying or that [Appellant] at least held a reasonable mistake of fact as to [LS's] consent during their encounter.

He further explained that:

> Our tactic was not to make [LS] appear as though she was scared or frightened of EW in any way, which is what her statement about him being "crazy" and having to say "no" appeared to imply. Rather our intent was to portray [LS] as the one who was unstable and obsessed to the point of fabricating a sexual assault claim to keep EW in her life.

Finally, Maj NL stated that they were able to establish during the course of the trial that LS and EW did "rekindle their relationship after the alleged sexual assault with [Appellant], making it appear as though her plan that night had worked." Again we do not second-guess reasonable strategic or tactical decisions of trial defense counsel. *Mazza*, 67 M.J. at 475 (citation omitted). There are reasonable explanations for trial defense counsel's actions and advice, and their individual and combined level of advocacy on Appellant's behalf was not "measurably below the performance . . . [ordinarily expected] of fallible lawyers." *Polk*, 32 M.J. at 153 (alteration and omission in original) (citation omitted). Accordingly, we conclude Appellant has failed to meet his burden to demonstrate deficient performance.

## B. Prosecutorial Misconduct

Appellant also alleges that the trial counsel committed multiple acts of misconduct when he "sought and introduced irrelevant evidence for the sole purpose of inflaming the emotions of the members," while "simultaneously disparaging" Appellant's "credibility." Specifically, Appellant argues that trial counsel erred when he questioned LS about her counterintuitive behavior on the night of the assault and her level of intoxication. Appellant also alleges that trial counsel erred by improperly asking members to put themselves in LS's position, improperly vouching for LS's credibility by stating that she "wasn't lying," and improperly disparaging Appellant by calling him a liar. Appellant contends that he was prejudiced by the misconduct and asks that we set aside his conviction. We disagree.

### 1. Additional Background

Appellant highlights portions of the trial as evidence of trial counsel's alleged prosecutorial misconduct.

#### a. Evidence of LS's Counterintuitive Behavior and Intoxication

During cross-examination, trial defense counsel elicited multiple different actions that LS could have taken on the night of the assault to escape Appellant. For instance, in response to questions on cross-examination, LS acknowledged that she could have called a taxi or ride service, could have gone to another room to call the police, or could have just left the house. On redirect examination, trial counsel then asked LS why she did not leave the situation when she was feeling uncomfortable. LS testified that she was "scared" and reacted differently than she thought she would have reacted. Trial counsel then elicited from LS her perception of how she had previously thought she would have reacted to being assaulted and how that compared to her actual reaction. LS answered: "Polar opposite. I did exactly what I didn't think I would do. I totally froze. I thought I would be able to scream and fight back, but I was scared and embarrassed and defenseless." Trial defense counsel did not object to this line of questioning, nor did they ask LS any further questions during re-cross-examination.

#### b. Placing Factfinder in Victim's Position

Appellant also highlights two portions from trial counsel's closing argument where he contends trial counsel improperly asked panel members to put themselves in LS's position:

> At this point, [LS] is crying. At first, she tears up and then starts crying, tears running down her face. She doesn't want to be a part of what's going on. She is ashamed. She's embarrassed. She's defeated, is what she tells you on the stand. And she also

tells you essentially, she's crying because in that moment in time, that moment that her parents had talked to her about, as a female, the moment that her mom and dad told her to be aware of everything going on. In that moment, regardless of all of those conversations that she has had, regardless of all of those thoughts she's given about how she would respond in that situation, she betrayed herself by responding polar opposite. Think about that feeling. Is there a right way to respond when someone takes the stand and tells you that that's why they respond?

Trial counsel later argued:

[LS] let [EW] know [that she was raped] in the text, and was there some anger here? Absolutely, there was some anger there, and she explained that to you all. She told you why she was angry. She was angry at the situation. She was angry in how she responded, and that anger came out towards [EW]. Not in a sense of trying to make him jealous. Not in a sense of trying to guilt trip him, but in a sense, at that point of being scared and being angry about what had happened to her.

And I'm sure that you all can relate. There are times in life when things happen to us, a bad day at work, a bad day somewhere, a bad day with the kids, and your anger, well caused by work, or by the kids or by something else comes out on someone else. Someone, who did not cause that anger. That's human response is what that is.

### c. Improper Vouching

Appellant also highlights the following portion of trial counsel's closing argument where he argues trial counsel improperly vouched for LS:

We also heard about a neck swab being taken, based on what [LS] was saying and we hear from [DD] why he tested the three swabs that he tested, because those are the most internal swabs. The important thing about the SAFE examination is this though, it is entirely voluntary, right? That's what we heard. [LS] is young. She's intoxicated. How big of a risk is it to take that SAFE kit? How big of a risk is it to take the SAFE kit if you are making all this up, when it's explained to you beforehand with [sic] going to be done to you. When it is explained to you beforehand why things are going to be done to you. How much of a risk is that if you are lying?

It was a risk for her, members, because she wasn't lying. She wasn't lying, because we heard from [DD].

### d. Disparaging Appellant

Appellant also highlights the following portion of trial counsel's rebuttal argument to show he was disparaged when trial counsel called him a liar:

> [M]embers, you have heard someone lie in this courtroom over the last couple of days. You have absolutely heard someone lie about the offenses before you over the last couple of days. Members, you can know that person lied by looking at all the evidence that has been presented to you through the lens of a common plan that has been brought before you, and I want to be very clear about this common plan.
>
> . . . .
>
> Members, the person who has lied to you in this court-martial, the person who you have heard lie in this court-martial, is [Appellant]. We are going to talk about that in a few minutes. We are going to talk about that lie and what it means, and what the law tells you regarding that lie.

### 2. Law

We review claims of prosecutorial misconduct and improper argument de novo; when no objection is made at trial, the error is forfeited, and we review for plain error. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted). The burden of proof under plain error is on the appellant, who must establish "(1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the [appellant]." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted).

"Trial prosecutorial misconduct is behavior by the prosecuting attorney that 'oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *Id.* at 178 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger*, 295 U.S. at 88) (additional citation omitted).

In presenting argument, trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). Trial counsel may strike hard but fair blows, but may not "inject his personal opinion into the panel's deliberations, inflame the members' passions or prejudices, or ask them to convict the accused on the basis of criminal predisposition." *United*

*States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citations omitted). In determining whether trial counsel's comments were fair, we examine them in the context in which they were made. *Gilley*, 56 M.J at 121 (citations omitted). We do not "surgically carve out a portion of the argument with no regard to its context." *Baer*, 53 M.J. at 238 (internal quotation marks omitted).

In assessing prejudice from improper argument, we analyze three factors: (1) the severity of the misconduct; (2) the measures, if any, adopted to cure the misconduct; and (3) the weight of the evidence supporting the conviction. *Sewell*, 76 M.J. at 18 (citing *Fletcher*, 62 M.J. at 184). To determine the severity of the misconduct, we apply a five-factor test:

> (1) the raw numbers—the instances of misconduct as compared to the overall length of the argument[;] (2) whether the misconduct was confined to the trial counsel's rebuttal or spread throughout the findings argument or the case as a whole; (3) the length of the trial; (4) the length of the panel's deliberations[;] and (5) whether the trial counsel abided by any rulings from the military judge.

*Fletcher*, 62 M.J. at 184 (citation omitted).

A conviction will be overturned only "when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *Id*. In assessing prejudice, the lack of a defense objection is "'some measure of the minimal impact' of a prosecutor's improper comment." *Gilley*, 56 M.J. at 123 (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)).

It is improper to ask panel members to put themselves in the victim's place. *Baer*, 53 M.J. at 238. This is referred to as the "Golden Rule." *Id*. However, it is not improper to ask the members to consider or imagine the victim's pain, terror, or anguish. *Id*.

Trial counsel may not personally vouch for a witness, and the "use of personal pronouns in connection with assertions that a witness was correct or to be believed" is improper. *Fletcher*, 62 M.J. at 180 (citation omitted). While it is improper for trial counsel to provide personal bolstering, there is no prohibition against arguing that a witness testified credibly. *See United States v. Chisum*, 75 M.J. 943, 953 (A.F. Ct. Crim. App. 2016) (holding that "marshalled evidence" in closing argument to support the government's claim that a witness told the truth, was proper argument), *aff'd*, 77 M.J. 176 (C.A.A.F. 2018).

Disparaging comments are improper "when they are directed to the defendant himself." *Fletcher*, 62 M.J. at 182. However, there is a distinction between comments that serve as "a personal attack on the defendant" and those which are "a commentary on the evidence." *Id*. at 183.

**3. Analysis**

### *a. Evidence of LS's Counterintuitive Behavior and Intoxication*

Appellant contends that trial counsel erred by eliciting irrelevant testimony from LS concerning how she reacted to being sexually assaulted by Appellant. Since trial defense counsel did not object, we review trial counsel's actions for plain error. We are not persuaded by Appellant's arguments that trial counsel's actions were improper. First and foremost, there is nothing impermissible with a victim discussing or explaining her personal reaction to the events leading up to, during, or after being sexually assaulted. In this case, LS was merely explaining the evidence of the case, which included events that occurred before, during, and after the assault.

Additionally, even if this evidence was questionable, trial defense counsel opened the door to this line of questioning. As noted above, trial defense counsel, during cross-examination, had LS confirm that she could have reacted differently when she felt uncomfortable. Specifically, trial defense counsel had LS acknowledge that she could have called a cab, or the police, or just left the house. As the Government argues, this line of questioning by trial defense counsel was at least implying that because LS could have avoided Appellant in any number of different ways that she must have consented to the sexual activity. It was only in response to trial defense counsel's questions that trial counsel asked LS why she responded the way she did and if her response was different than the way she thought she would have reacted.

It is well-settled law under the invited response doctrine that the Government is not prohibited "from offering a comment that provides a fair response to claims made by the defense" in argument. *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citations omitted). This same doctrine also applies to the presentation of evidence. *See Gilley,* 56 M.J. at 120–22. We see no obvious error in trial counsel eliciting testimony from LS about why she reacted the way she did and explaining that her behavior was different than how she thought she would have reacted, especially after the Defense attacked her credibility on precisely those grounds. At the very least, LS's testimony provided a fair response to a claim made by trial defense counsel. We also disagree with Appellant's assertion that only an expert witness can testify on counterintuitive behavior. Certainly a victim of sexual assault is permitted to discuss the surrounding circumstances regarding how she reacted to being sexually assaulted and whether it was consistent with how she thought she would have reacted. This was fair commentary on the evidence, and therefore trial counsel did not err in soliciting this testimony.

Appellant also argues that it was error for trial counsel to admit evidence concerning LS's intoxication on the night of the assault. Appellant contends

that this evidence was not used as circumstantial evidence of LS's lack of consent and was only used to "evoke impermissible sympathy for [LS]." Specifically, Appellant points to the Government's theme at trial: "intoxication, isolation and initiation [of sexual intercourse]." Additionally, Appellant points to the fact that the Government's opening statement and closing argument were "peppered with references to [LS]'s level of intoxication and how that level should be considered by members." As our court has recently held, evidence of intoxication is relevant as one of the "surrounding circumstances" to determine whether an individual consented. *See United States v. Williams*, No. ACM 39746, 2021 CCA LEXIS 109, at \*55 (A.F. Ct. Crim. App. 12 Mar. 2021), *rev. granted*, 2021 CAAF LEXIS 595 (C.A.A.F. 25 Jun. 2021). As both Appellant and LS had consumed alcohol on the night of the assault, LS's level of intoxication is relevant as part of the surrounding circumstances of this case. Likewise, we find no error in the presentation of this evidence and therefore no prosecutorial misconduct.

### b. Placing Factfinder in Victim's Position

Appellant contends that trial counsel made a prohibited "Golden Rule" argument when he asked the members during his closing argument to "[t]hink about that feeling." Trial defense counsel did not object to this argument, and thus we review trial counsel's statement for plain error. We are not persuaded that trial counsel violated the prohibition against invoking the "Golden Rule." Trial counsel did not explicitly ask the panel members to put themselves in the position of LS. Instead, we construe his comments to be an argument that LS's counterintuitive actions were not evidence of her consent. Stated another way, trial counsel did not ask the members how they would have behaved in that situation, he asked them not to judge LS based on how she behaved.

As to the second portion of trial counsel's closing argument highlighted by Appellant, where trial counsel stated, "And I'm sure you all can relate," we again find no plain error. Trial counsel again did not so much ask the members to stand in LS's position as he asked them to draw upon their common experience in assessing LS's credibility. It is well established that "members are expected to use their common sense in assessing the credibility of testimony as well as other evidence presented at trial." *United States v. Frey*, 73 M.J. 245, 250 (C.A.A.F. 2014) (citations omitted). Counsel are permitted to "ask the members to draw on ordinary human experience" in their argument. *United States v. Stargell*, 49 M.J. 92, 94 (C.A.A.F. 1998). Trial counsel here provided commentary on the evidence properly before the members, in particular the testimony from LS, and then asked the members to look at their own human experience and to apply their common sense in evaluating her testimony. Appellant has not shown plain error.

### c. Improper Vouching

Appellant alleges that trial counsel improperly vouched for LS's credibility by stating that she "wasn't lying." Since trial defense counsel did not object, we review this statement for plain error. We disagree with Appellant's contention and find only proper argument.

To place this statement in its proper context, Appellant made clear at trial that his theory of the case was that LS had fabricated the entire allegation. The Government, on the other hand, sought to defend LS's credibility by pointing to evidence supporting her initial report of the assault. The statement highlighted by Appellant was in a portion of trial counsel's argument rebutting Appellant's theory by highlighting indications that LS had been telling the truth all along. Trial counsel's rebuttal argument was based on evidence that the members heard regarding the fact that LS maintained her account despite the invasive nature of the SAFE exam, and also that the DNA evidence corroborated her account and testimony. This is a permissible way to orient the members to the evidence of the case that supported her testimony. At no time did trial counsel either improperly place the prestige of the Government behind LS, or make explicit personal assurances concerning LS's veracity. Trial counsel's credibility argument was based on evidence properly before the members and thus was fair argument for the permissible purposes of explaining the evidence and rebutting Appellant's theory.

### d. Disparaging Appellant

Appellant also contends that trial counsel improperly disparaged his character during closing argument by calling him a "liar." Since trial defense counsel did not object to this argument, we again review for plain error.

In the passage highlighted by Appellant's counsel, trial counsel first referred to the fact that someone "lied" and then later argued "the person who you have heard lie in this court-martial, is [Appellant]." We agree with our superior court that calling Appellant a liar is a "dangerous practice that should be avoided." *Fletcher*, 62 M.J. at 182 (quoting *United States v. Clifton*, 15 M.J. 26, 30 n. 5 (C.M.A. 1983)) However, the question is whether these comments rise to the level of plain error. We are not pursuaded that these comments were so obviously improper as to merit relief.

Appellant's trial presented dueling theories and versions of events. Appellant's trial defense counsel took the position that LS had lied, while the Government took the position that Appellant had lied to SA TW. After making these statements, trial counsel proceeded to discuss the evidence, which he argued was sufficient for the members to conclude that Appellant's statement to SA TW was in fact not true. Trial counsel went on to argue that the members could take Appellant's statement to AFOSI and:

[B]utt it up against the other evidence, and you can determine whether or not he is lying. The government submits to you that absolutely the evidence suggests to you that he is. There is only one way to take, before anything, before anything actually like got going. There is only one way to take that, and that is this, my penis was never inside her.

Trial counsel again discussed Appellant's AFOSI statement near his conclusion, and referred directly to the military judge's instruction on a false exculpatory statement in arguing that members could infer that Appellant's statement demonstrated consciousness of guilt. Placed in this context, we are convinced that trial counsel properly argued Appellant's out-of-court statements were not believable based on the evidence presented and did not commit prosecutorial misconduct by personally attacking Appellant. *See Fletcher*, 62 M.J. at 183. We also conclude that trial counsel did not commit plain error as alleged by Appellant, and are confident that that the members convicted Appellant on the basis of the evidence alone. *Id.* at 184 (citation omitted).

## C. Legal and Factual Sufficiency

Appellant contends that his convictions are both legally and factually insufficient. The crux of Appellant's argument focuses on his claim that LS was not a sufficiently credible witness. Specifically, Appellant argues that LS fabricated the allegation of sexual assault in order to gain the attention of her ex-boyfriend, EW, and that her allegation and testimony were deliberate lies to further this result. Appellant also argues that he had a reasonable mistake of fact as to LS's consent. We disagree.

### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes,* 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted). In considering the record, we "may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses." Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1).

The test for factual sufficiency "is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are "convinced of the accused's guilt beyond a reasonable doubt." *United States v. Reed,* 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United*

*States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986), *aff'd,* 77 M.J. 289 (C.A.A.F. 2018)).

"In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington,* 57 M.J. at 399).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario,* 76 M.J. 114, 117 (C.A.A.F. 2017)). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King,* 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

In order to prove the offense of sexual assault the Government was required to prove beyond a reasonable doubt two elements: (1) Appellant committed a sexual act upon LS; and (2) Appellant did so without her consent. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM),* pt. IV, ¶ 60.b.(2)(d).

> The term "consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent. Submission resulting from the use of force, threat of force, or placing another person in fear also does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue does not constitute consent.

*MCM*, pt. IV, ¶ 60.a.(g)(7)(A). "All the surrounding circumstances are to be considered in determining whether a person gave consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(C).

The defense of mistake of fact as to consent applied if Appellant, because of ignorance or mistake, incorrectly believed that LS consented to the sexual act. *See* R.C.M. 916(j)(1). In order to rely on mistake of fact as to consent as a defense, Appellant's belief must be reasonable under all the circumstances. *See id*.; *see generally United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998) (quoting *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995)). Once raised, the

Government bears the burden to prove beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *see also United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019).

**2. Analysis**

We are convinced that Appellant's conviction of sexually assaulting LS is legally and factually sufficient. In assessing the legal sufficiency, we limited our review to the evidence produced at trial and considered it in the light most favorable to the Government. *See Robinson*, 77 M.J. at 297–98; *Dykes,* 38 M.J. at 272. We conclude that a rational factfinder could have found beyond a reasonable doubt the essential elements of Appellant's convicted offense, and that Appellant had no reasonable mistake of fact as to consent. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *See Reed,* 54 M.J. at 41.

In this case, there was sufficient evidence to establish the essential elements of sexual assault beyond a reasonable doubt. At trial, LS's testimony alone was sufficient to establish proof of the two elements necessary for the charge; LS testified that Appellant's penis penetrated her vagina, and that he took this action without her consent. There was also evidence presented that detailed LS's immediate report of the sexual assault to law enforcement. The members were able to view the body camera video taken from PE after he made initial contact with LS. This video showed LS visibly upset, and crying so hard she could barely answer PE's questions.

Additionally, the Government presented testimony from DD, a forensic DNA examiner, who performed the DNA analysis on the swabs taken from LS at the hospital and also analyzed swabs collected from Appellant. DD testified that his analysis detected a male DNA profile on the vaginal swabs taken from LS, and that Appellant could not be excluded from the male DNA profile discovered on the outer vaginal swab, the vaginal swab, or the cervical swab. DD testified that the probability of a random male individual's DNA being present with that particular profile was one in 1,111 for caucasian individuals. DD concluded his testimony by stating that his findings were consistent with Appellant's penis penetrating LS's vulva.

While Appellant argues that LS "voluntarily engaged in consensual sexual activity" with him in order to make EW jealous, he points to no evidence in the record to support that assertion. Additionally, as to LS providing false testimony to support her "plan," we only find evidence that contradicts this assertion. In fact, the panel members were able to observe not only LS's demeanor in court, but also her demeanor on the bodycam video. Appellant's counsel were

able to cross-examine LS and also heard testimony from two different witnesses that LS was an honest and truthful person. The panel also heard testimony from SrA NM and KS who corroborated LS's memory of the evening up until the point when they went to sleep. SrA NM and KS also corroborated Appellant's sexual interest in LS and the fact that Appellant denied having sex with LS. Such corroboration and consistency support LS's credibility and undermine the suggestion she fabricated her allegation of the assault. We conclude that there was sufficient evidence to establish proof of each element of the offense beyond a reasonable doubt.

As to Appellant's claim that he had a reasonable mistake of fact regarding LS's consent to the sexual act, we note that Appellant did not testify and therefore the only evidence supporting his subjective belief at trial was derived from his statements to KS, SrA NM, and SA TW. While Appellant admitted to kissing LS, he never admitted to having sex with LS, and he never claimed that he believed she consented to sex. By avoiding a discussion of sexual activity with KS and SrA NM, and by telling SA TW that "before anything like actually got going, like she started crying," Appellant's own words demonstrated that he did not reasonably believe that she consented to sexual penetration, and Appellant's misleading renditions of the events further demonstrate a consciousness of guilt on his part. Additionally, LS's testimony that Appellant kept trying to calm her down by telling her "it's fine" is evidence that he knew she was upset and was not consenting. Finally, the panel had before it evidence that Appellant told LS that he was going to record her stating that the sex was consensual. This again provides some evidence that Appellant was aware of the criminality of his actions. Not only did LS testify to her belief that Appellant had recorded her, but KS also testified that Appellant mentioned the recording. Taken together these facts provided additional evidence that Appellant did not have a reasonable mistake of fact, but in fact knew that LS did not consent to the sexual activity.

In assessing legal sufficiency, we considered the evidence produced at trial in the light most favorable to the Government. In doing so, we conclude a rational factfinder could have found beyond a reasonable doubt all the elements to support Appellant's conviction for sexual assault. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's convictions both legally and factually sufficient.

**D. Request for Deferment**

On 12 October 2019, eight days after his court-martial concluded, Appellant submitted matters to the convening authority through his trial defense counsel. Specifically, Appellant requested that the convening authority both

defer the adjudged reduction in grade until action was taken on his case and waive the adjudged forfeitures at his new pay grade (E-1) until such "deferment/waiver" is rescinded or until entry of judgment by the military judge.[7] On 16 October 2019, the base staff judge advocate recommended rejecting both the request for deferment of reduction in grade and waiver of the adjudged forfeitures. On 24 October 2019, the convening authority signed his Decision on Action memorandum that stated that he took "no action" on the findings or sentence and did not specifically address Appellant's deferment and waiver requests. The military judge signed the entry of judgment on 22 November 2019.

The record also contains a memorandum from Staff Sergeant ADV, dated 31 January 2020. This memorandum stated that the convening authority's "decision to not act on deferment" was done via the convening authority's Decision on Action memorandum. We note that Appellant did not seek to address any potential errors in the action of the convening authority under R.C.M. 1104(b)(2)(B), or challenge whether the convening authority made a decision on deferment under R.C.M 1103(d)(2). Appellant also did not allege error or assert any prejudice in his initial brief to this court concerning the convening authority's action or inaction on his request for deferment.

On 4 May 2021, we specified an issue on whether Appellant is entitled to appropriate relief for the convening authority's failure to act on Appellant's request for deferment of reduction in rank as required by R.C.M. 1103(d)(2). In response, the Government submitted a declaration, dated 17 May 2021, from Lieutenant General (Lt Gen) Timothy Haugh, the convening authority in Appellant's case.[8] In the declaration, Lt Gen Haugh stated that after Appellant's court-martial, Appellant submitted a request for deferment of his adjudged reduction in grade and waiver of the adjudged forfeitures. Lt Gen Haugh explained that after consulting with his staff judge advocate and reviewing the materials submitted by Appellant, he denied both requests. Lt Gen Haugh further stated that he considered the standard for deferment under R.C.M. 1103 and determined Appellant failed to demonstrate that his interests "in deferral

---

[7] We note that in the subject line of Appellant's clemency submission, he asked the convening authority to waive the automatic forfeitures of pay under Article 58b(b), UCMJ, 10 U.S.C. § 858b(b), for the benefit of his son. However, in the body of his request, he erroneously asked for waiver of adjudged forfeitures. Appellant was sentenced to adjudged forfeitures, but would be subject to automatic forfeitures by virtue of his sentence to both confinement and a punitive discharge.

[8] Because the issue of the deferment request was raised in the record but was not fully resolvable by those materials, we have considered the declaration from Lt Gen Haugh as supplementing the record, consistent with *United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020).

outweighed the community's interest in imposition of punishment on the effective date." He did not, however, assert he reduced his denial of Appellant's deferment request to writing at the time he made his decision or offer any explanation as to why he did not do so. In Appellant's response to this issue, Appellant now contends that the convening authority erred because the Decision on Action memorandum was "not responsive" to his request for deferment. Appellant argues that he suffered prejudice in that he was deprived of his right to challenge the convening authority's denial under R.C.M. 1103(d)(2).

When a member requests deferment, he has the burden of showing that his interests and those of the community in granting the deferment outweigh the community's interest in imposing the punishment on its effective date. R.C.M. 1103(d)(2). The Rules for Courts-Martial list factors the convening authority may consider in acting on a deferment request, including the nature of the offense, the sentence, the effect a deferment would have on good order and discipline in the command, and the requesting member's "character, mental condition, family situation, and service record." *Id.* A convening authority's decision on a deferment request must be in writing, attached to the record of trial, and a copy must be provided to the appellant and the military judge. *Id.* Unlike decisions on deferment requests, there is no requirement for decisions on requests for waiver of automatic forfeitures to be in writing. *United States v. Edwards*, 77 M.J. 668, 670 (A.F. Ct. Crim. App. 2018); *see also* R.C.M. 1103(h).

We review a convening authority's decision on a deferment request for an abuse of discretion. R.C.M. 1103(d)(2); *United States v. Sloan*, 35 M.J. 4, 6 (C.M.A. 1992), *overruled on other grounds*, *United States v. Dinger*, 77 M.J. 447 (C.A.A.F. 2018). In reviewing challenges to deferment denials, we have not required convening authorities to provide in-depth analyses as to their rationale; instead, we have required them to simply identify the reasons for the denial. *See, e.g.*, *United States v. Bell*, No. ACM 39447, 2019 CCA LEXIS 293, at \*5 (A.F. Ct. Crim. App. 9 Jul. 2019) (unpub. op.). We have found error with respect to deferment denials when the convening authority advances no reason for the denial at all. *See, e.g.*, *United States v. Paulett*, No. ACM 39268, 2018 CCA LEXIS 444, at \*18 (A.F. Ct. Crim. App. 14 Sep. 2018) (unpub. op.).

A convening authority's omission does not entitle Appellant to relief unless it materially prejudiced a substantial right. *United States v. Eppes*, No. ACM 38881, 2017 CCA LEXIS 152, at \*43 (A.F. Ct. Crim. App. 21 Feb. 2017) (unpub. op.) (citing Article 59(a), UCMJ, 10 U.S.C. § 859(a)), *aff'd*, 77 M.J. 339 (C.A.A.F. 2018). "[A]bsent credible evidence that a convening authority denied a request to defer punishment for an unlawful or improper reason, an erroneous omission of reasons in a convening authority's denial of a deferment request does not entitle an appellant to relief." *Id.* at \*43 (quoting *United States v. Zimmer*, 56 M.J. 869, 874 (A. Ct. Crim. App. 2002)).

Regardless of when the convening authority made his decision to deny Appellant's deferment request, he erred by not putting that decision in writing and by not serving it on either Appellant or the military judge as required by R.C.M. 1103(d)(2). Finding error, we turn our attention to whether the convening authority's error materially prejudiced any of Appellant's substantial rights.

We see no evidence in this case that Appellant was materially prejudiced by the convening authority's failure to put his decision in writing, or that the convening authority's denial was for an unlawful or improper reason. Here, despite having the opportunity, Appellant never sought judicial review of the convening authority's R.C.M. 1103(d)(2) decision via a R.C.M. 1104(b)(2)(B) post-trial hearing. Appellant's first and only mention of possible error or prejudice concerning the convening authority's action or inaction in this case was in his response brief to this court after we specified the issue. The convening authority's after-the-fact explanation for his denial balanced Appellant's interests against the severity of Appellant's crime and the effect of deferment on good order and discipline. Without the necessary showing of prejudice, we conclude no relief is warranted. *See United States v. Jalos,* No. ACM 39138, 2017 CCA LEXIS 607, at *5–6 (A.F. Ct. Crim. App. 5 Sep. 2017) (unpub. op.) ("Even when there is error in the convening authority's action on a deferment request, relief is only warranted if an appellant makes a colorable showing of possible prejudice.").

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

Accordingly, the findings and sentence are **AFFIRMED**.[9],[10]

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[9] We note the Statement of Trial Results in this case failed to include the command which convened the court-martial as required by Rule for Courts-Martial (R.C.M.) 1101(a)(3). Appellant has made no claim of prejudice, and we find none. *See United States v. Moody-Neukom,* No. ACM S32594, 2019 CCA LEXIS 521, at *2–3 (A.F. Ct. Crim. App. 16 Dec. 2019) (per curiam) (unpub. op.).

[10] Although not raised by Appellant, we also note that the entry of judgment (EoJ) fails to document Appellant's deferment of reduction in grade request and the convening authority's action on Appellant's request as required by R.C.M. 1111(b)(3)(A), R.C.M. 1111(b)(3)(B). Appellant has not claimed any prejudice as a result of this error, and we find none. We direct the Chief Trial Judge, Air Force Trial Judiciary, to have a detailed military judge correct the EoJ accordingly, prior to completion of the final order under R.C.M. 1209(b) and Air Force Instruction 51-201, *Administration of Military Justice*, Section 14J (18 Jan. 2019).